ANDREWS *v.* TAMARACK MINING CO.

| 114 | 375 |
| 120 | 133 |
| 114 | 375 |
| 128 | 568 |
| 114 | 375 |
| s72NW | 242 |
| 131 | ¹145 |

1. MASTER AND SERVANT — ACTION FOR DEATH OF EMPLOYÉ — EVI-
DENCE—ADMISSIONS OF AGENT—TESTIMONY AT CORONER'S INQUEST.
   In an action against a mining corporation for the death of a
   miner killed by falling walls, the testimony of the mining
   captain, who had charge of all the underground work, given
   at the coroner's inquest over the body of the deceased, that he
   had ordered precautions to be taken to avoid accident, because
   he did not consider the place safe, is inadmissible, where it is
   offered, not for purposes of impeachment, but to prove the
   substantive fact that defendant, through its agent, had knowl-
   edge of the danger.

2. SAME—SCOPE OF AUTHORITY.
   The fact that the captain was, with respect to the underground
   mining operations, the *alter ego* of defendant, would not make
   his admissions, not within the scope of his agency, binding
   upon it.

3. SAME—DANGEROUS PLACE—FAILURE TO NOTIFY EMPLOYÉ.
   A mining corporation is liable for the death of a miner killed by
   falling rock in the course of his employment as a "hitch
   cutter," where it put him at work in an excavation wherein
   the walls were unsupported by stull timbers, notwithstand-
   ing there was room for two or three sets of such supports as
   they are commonly placed, without informing him of the
   fact, which it well knew, but of which he was ignorant, that
   the walls of the excavation had been left unsupported since
   the preceding day, and that the character of the walls was
   such that those which appeared perfectly safe were liable, if
   left for that length of time without support, to break suddenly
   and fall.

4. SAME—ASSUMPTION OF RISK — EVIDENCE—QUESTION FOR JURY.
   That the deceased had knowledge of the danger equal to that
   possessed by his employer was not conclusively established by
   evidence that the "hitch cutters" were directed by the de-
   fendant to examine each place where they were about to go ·
   to work, and to satisfy themselves, before beginning the work,
   that the place was safe; that they were frequently cautioned
   as to this duty, and were warned against working, under any
   circumstances, beneath overhanging ground, without assuring

themselves that it was safe; that they were allowed to take all the time and have all the assistance necessary to make it safe, if they considered it dangerous; and that they under-stood that this was one of their particular duties, and that no one would go ahead of them to perform it. GRANT and HOOKER, JJ., dissenting.

5. SAME—INSTRUCTIONS.
    The court should, however, have directed the attention of the jury to such facts, in connection with his charge as to the master's duty to furnish the servant with a safe place to work.

Error to Houghton; Hubbell, J. Submitted April 16, 1897. Decided September 23, 1897.

Case by Grace E. Andrews, administratrix of the estate of Nicholas J. Andrews, deceased, against the Tamarack Mining Company, for negligently causing the death of plaintiff's intestate. From a judgment for plaintiff, defendant brings error. Reversed.

*A. R. Gray*, for appellant.

*M. M. Riley* (*Sylvester, Scheiber, Riley & Orth*, of counsel), for appellee.

LONG, C. J. Plaintiff's intestate was a miner in the employ of the defendant, a corporation owning and operating a copper mine in the Upper Peninsula. The hanging walls of the mine were of such a character that they would crack suddenly and fall away if left exposed to the air even for a short time; so that, to safely carry on the work, it became necessary to place batteries of stull timbers, extending from the foot to the hanging wall, about eight feet apart, each battery consisting of three timbers. About 11 o'clock in the forenoon of the day before plaintiff's intestate, Nicholas J. Andrews, was killed, one Thomas Maslin, the underground captain of defendant's mine (having charge of all the underground work), while on his daily tour of inspection through the mine, ordered two of the miners, named Weisonen and Kemp-

anen, to drill three holes in the hanging wall and blast it down, so that a battery of timbers might be put in there, as soon as they had finished the work in which they were engaged.    They did not finish the work they were doing that night.    On quitting work in the evening, they informed the men working on the night shift of the orders given by Captain Maslin, and these men commenced to drill three holes for the purpose of blasting down the overhanging rock.    They completed two holes, and had commenced on the third, before leaving their work.

Plaintiff's intestate had been in the employ of the defendant about two weeks at this time, as a hitch cutter. He had previously worked in this same mine, and knew the character of its formation, and the duties of a hitch cutter, which were to cut holes in the foot wall for the timbers to set in to support the hanging wall.    The holes or hitches were cut to prevent the lower ends of the timbers, which extended obliquely from the foot to the hanging wall, from slipping.    On the morning when Andrews was killed, he and his partner (these hitch cutters work in couples), one Trevarrow, were ordered into that level to cut hitches for the timbers.    The miners were drilling the third hole in the overhanging wall when Andrews and his partner arrived.    The miners, before commencing their work that morning, had tried the ground or rock above, using two iron bars at a time for that purpose, but could not move it.    The timber gang of four men was also there, having gone with Andrews and his partner, and they spent from an hour to an hour and a half taking down some loose rock; and they, too, tried this particular piece of ground, using three bars at a time, but could make no impression on it.    Andrews and his partner stood all this time looking on, in full view of and observing the work, the place being lighted so that the rock and the working could be seen.    After the loose rock had been barred down and the particular piece of rock had been tried, all seemed to consider the place safe; and Andrews and his partner, without making any further or other examina-

tion, began this work of cutting hitches in the foot wall. They had been at work about an hour, when a sudden crack was heard, and the piece of rock referred to suddenly fell, striking Andrews and killing him almost immediately, and somewhat injuring his partner. It appears that this timbering was not done to protect vein matter, but to protect from the rock after the vein is removed.

The first count of the declaration, after charging the duty of the defendant, alleges, in substance, that the defendant negligently failed to keep and maintain the said drifts, crosscuts, stopes, and chambers in and about its said mine in reasonably safe condition, etc., and negligently failed to properly timber the said drifts, etc., so as to secure and prevent any pieces that might become loosened in the roof of such drifts, stopes, crosscuts, and chambers from falling, etc., and negligently failed, after it had come to its knowledge that such stopes, etc., had become unsafe, to warn the said Andrews and others of its said employés working therein of the dangerous condition thereof, and that, by reason of the negligence and failure on the part of said defendant to discharge such duties in the premises as aforesaid, the said Andrews, while in the course of his employment, etc., was killed, etc.

On the trial the plaintiff called the coroner of the county, who testified that Captain Maslin was sworn before him as a witness in the inquest held upon the body of Nicholas J. Andrews. The record returned here states what then took place, as follows:

"Counsel for plaintiff here attempted to prove by this witness the testimony of Captain Maslin given before him as coroner upon the inquest, for the purpose of proving an admission of Captain Maslin adverse to the interests of the defendant. Counsel for defendant objected to this as immaterial and incompetent; that it could only be proper for one purpose, viz., to impeach Captain Maslin, who had not yet been on the stand. Counsel for plaintiff announced that he did not intend to impeach Captain Maslin at all.

"*The Court:* The court holds that it is not necessary at all, in order to show how this accident occurred, for Captain Maslin to be called; for the plaintiff can show by admissions of the defendant just how it occurred, and put the defense upon its showing that it occurred some other way. I think it is clearly admissible,—the proceedings at the coroner's inquest,—to determine the cause of this man's death, and I think that whatever Captain Maslin may have sworn to there is admissible here. I don't think this witness can read that over, and say that it is substantially what he swore to, but whatever he said must be produced."

This deposition was read in evidence, and is as follows:

"I am underground captain of the Tamarack mine. I gave the miners Weisonen and Kempanen express orders yesterday to put three holes in the ground, and to blast it down, as I did not consider it safe. These men, for reasons of their own, did not do so. Had they obeyed my orders, the accident would not have happened."

The court was in error in permitting this deposition to be read. It was not offered for the purpose of impeaching Captain Maslin, but for the purpose of proving a substantive fact; that is, that Maslin knew the mine was in a dangerous condition when he ordered the men in there. It is conceded that it was no part of the *res gestæ.* It has many times been held by this court that the declarations of an agent as to a past transaction are inadmissible to bind the principal. *Michigan Cent. R. Co.* v. *Coleman,* 28 Mich. 440; *Mabley* v. *Kittleberger,* 37 Mich. 360; *Patterson* v. *Railway Co.,* 54 Mich. 91; *Stebbins* v. *Township of Keene,* 55 Mich. 552; *Wormsdorf* v. *Railway Co.,* 75 Mich. 472 (13 Am. St. Rep. 453). It is true that, where the acts of the agent will bind the principal, then his representations, declarations, and admissions respecting the subject-matter will also bind him, if made at the same time, and constituting a part of the *res gestæ.*

But counsel for plaintiff contend that Captain Maslin was the *alter ego* of defendant, and that his agency continued at the time his testimony was given before the coroner; therefore, whatever Maslin said in reference

to the occurrence at the mine would be binding upon the defendant, though said long after the occurrence. If he can be said to be the *alter ego*, he was not clothed with authority to make admissions. It is not like the case where the agent is clothed with such power, as that of baggagemaster of a railroad, whose duty it is to deliver the baggage of passengers, and to account for the same if missing, providing inquiries are made. Declarations so made by such agent are within the scope of his agency, and, if made while the agency continues, are admissible against his principal. *Morse* v. *Railroad Co.*, 6 Gray, 450.

But counsel contend that the deposition could not have injuriously affected the defendant, as Captain Maslin was subsequently called as a witness on the trial, and testified substantially as he did before the coroner. We do not find anything in the testimony of Captain Maslin to sustain this contention. On the other hand, he testified that on the day before the accident he was in the mine, and ordered the men to blast down the ground in the hanging, and he adds:

"I did not find a particle of danger in that ground, nor did I see anything to lead me to believe it was dangerous. My object in taking it down was to put timbers in there."

His attention was called to the testimony taken before the coroner, as written down by the coroner, and he stated, "Well, my meaning was not as it is construed in that paper;" and he states positively that he did not testify as the coroner had written it down. On cross-examination he stated that he did not warn Andrews and his partner not to go there until the overhanging rock was blasted down; that it was not necessary to do that, as they were warned every day. He was asked:

" Now, when you knew that it was unsafe, and you concluded that it was not safe to mine further without calling their attention to it, without having the hanging wall taken down, why didn't you warn them then?

"*A.* I didn't know it was unsafe then.

"*Q.* When you concluded it wouldn't be well to mine further without taking that hanging down,—this portion you speak of,—why didn't you warn the men?

"*A.* Because it was not necessary; it was not dangerous."

From this testimony it is apparent that Captain Maslin did not testify upon the trial as contended by counsel, but that he did state positively and unequivocally that he did not regard the place as dangerous, and that the error in permitting the coroner to read the testimony taken before him was not cured.

But counsel for plaintiff contend that the place was made dangerous by the excavation's being worked too far under, and left too long a time, without putting in the sets of stull timbers, as was usual; that this was done under the direction of Captain Maslin, who knew that if too great excavation was made, and the timbers not at once placed, the hanging walls, being left exposed, would crumble or break off and fall; that he, knowing this, sent the men in without warning them of the dangerous condition. We think there is some evidence to sustain this contention. Mr. Parnall, the superintendent of the mine, testified that ofttimes when the overhanging wall appeared safe it would suddenly break off and fall, and this within the space of a few minutes. It was also shown that, when the excavation had been carried forward, the stull timbers were put in every seven or eight feet; that is, three timbers, near together, set in the hitches cut in the foot wall, and reaching to the overhanging wall. There is some evidence that, on the morning in question, the excavation had been carried so far under that there was room for two and perhaps three sets of stull timbers. While the evidence is not very clear upon this question, we are not able to say that there is no evidence of that fact. If the place was unsafe without the stulls being placed every seven or eight feet, it was the duty of the defendant to so place them, as it was its duty to furnish Andrews a safe place to work. These questions were for the determination of the jury. But at the same time the

jury should have been instructed that if Andrews knew the condition of the overhanging walls,—that they were liable to crack off if left for any length of time, and that they had been left in that condition from the previous day without sufficient stulls being placed there to protect the walls,—and yet went to work with full knowledge of such danger, the plaintiff could not recover, in the absence of any promise of the company to put it in a safe condition.

Under the method adopted by the defendant company, these hitch cutters were required in all cases to examine all places where they might go to work, and see and satisfy themselves that such places were safe, before beginning their work, and they were frequently cautioned and warned as to this duty, and that they must never, under any circumstances, work under overhanging ground without first examining it, and being satisfied that it was all right, and, if found dangerous, to make or have it made safe; and they were allowed to take all the time and have all the assistance necessary for that purpose, and they understood and knew that no one would go ahead of them for that purpose, but that that was one of their particular duties. And the court should have directed the attention of the jury to those facts.

For the errors pointed out, the judgment must be reversed, and a new trial ordered.

MONTGOMERY and MOORE, JJ., concurred with LONG, C. J.

GRANT, J. 1. I concur in the reversal of this case, and in the opinion of my Brother, the Chief Justice, except in so far as he holds that there was any evidence upon which to base a verdict against the defendant. The following facts are conclusively established by the evidence:

(1) It has been for some years the universal practice and policy of the defendant to employ only experienced miners as hitch cutters, because it is important that men so employed should be able to determine for themselves the safety of the place.

(2) The deceased and Trevarrow, his companion, were competent and experienced miners.

(3) It was the duty of all hitch cutters to examine the surroundings before proceeding to work, and, if they saw any rock which in their judgment was dangerous, to remove it before proceeding to cut the hitches, and, if they were unable to do so, to procure assistance.

(4) The deceased and Trevarrow went to work after they had made an examination, and had determined for themselves that the situation was safe.

(5) The miners who were engaged in drilling had examined it before going to work that morning, and tried to get the rock down with two iron bars, but could not move it. Four men, comprising the timber gang, were also there; and they used three iron bars in attempting to remove the rock, but could make no impression upon it.

(6) During the time that these examinations and attempts to take down the rock were being made, the deceased and Trevarrow were close by, looking on. It thus appears that eight experienced miners had examined the situation and pronounced it safe, and in that belief had gone to work.

(7) These men were all experienced and competent miners, and familiar with the character of the rock in the defendant's mine. They were as competent to judge of the danger as was Captain Maslin, who was not present when the examination was made.

The situation, in brief, is this: These men were authorized and were expected to judge for themselves as to the safety of the place. They were competent to do so. They had been cautioned against working in dangerous places. They placed no reliance upon the judgment of any other employé, officer or man, but used their own judgment. They were at liberty to withdraw if they considered the place dangerous. I am not aware of any decision in this court or any other which holds the master liable under such a state of facts. It is repugnant to common justice. Captain Maslin had not instructed them to go to work in this place if they considered it dangerous. He had instructed the drillers the day before to drill in three holes to blast down this hanging rock. He had also instructed the hitch cutters and timbermen to perform

the customary work in such places. The drillers were engaged in drilling these holes when the rock fell. The master in this case had furnished the proper tools and appliances, competent and experienced men, and had instructed them to exercise their own judgment as to the safety of the place, and had authorized them, if in their judgment the place was unsafe, not to go to work, but to take the necessary steps to render the place safe. In so doing the master had done all that the law or humanity requires. The rule as to the duty of the master to furnish a safe place has no application here. If Captain Maslin had been present, and instructed them to go to work notwithstanding their apprehension of danger, and had assured them that the place was safe, a different question would be presented. If it be assumed that Captain Maslin the day before instructed the drillers "to put three holes in the ground and blast it down, as he did not consider it safe," this could not be construed, by any possible rule of law, into an instruction and direction that any employé of defendant should go to work in the dangerous place. I deem it unnecessary to cite authorities in support of the proposition that plaintiff had made no case.

2. Assuming that there is a case for the jury, there is one error to which the Chief Justice has not referred, and that is the intemperate language used by the attorney for the plaintiff in his argument to the jury. He called Captain Maslin "a tyrant, for whom he had less respect than he would have for a barking whelp in the street; that Tom Maslin, with his little soul, thought more of the cost of sending those men to put timbers in there than he did of the human lives that were under his control; and that ten million souls of men like that could get inside a mustard seed and never lack for room." This language was not rebuked by the court. But this is not all. After the first attack of the attorney upon Captain Maslin, the record shows the following:

"*Mr. Riley:* Why do I say so? Because, sir, you, on your solemn oath, before your God, have told me, what?

That you dare not, in the presence of high Heaven, raise your hand and return a fair and impartial verdict in this case.   Why?

"*Mr. Gray:* I except to that, your honor.

"*Mr. Riley:* Why did you swear so?   Because, forsooth, your sister-in-law, employed by this Tamarack Mining Company, if you did return a verdict as your heart and your conscience should direct, would discharge her from their employ.

"*The Court:* Mr. Riley, that is not a proper remark to the jury.   You have not exhausted your challenges to the jury.   It was your duty to take him off.

"*A Juror:* Your honor, I would rather have Mr. Riley leave that out altogether.

"*The Court:* It is not called for.   It is unprofessional. That juror was accepted by you as satisfactory.

"*Mr. Gray:* He was excused, and then Mr. Riley insisted upon his coming back into the box.

"*Mr. Riley:* All that is admitted, but the facts remain; but I shall not discuss them further."

There is nothing in this record to justify the use of such language, and it was properly condemned by the trial judge as unprofessional.   What effect it had upon the jury, we cannot tell; but something induced them to render an extravagant verdict for the plaintiff, of over $12,000, the interest of which would alone be more than the annual earnings of the deceased, assuming that he worked every working day in the year.   His pay was $2 per day, and the interest on the amount of the verdict would exceed $2.50 per day, leaving the principal untouched.   This would result in giving his family more pecuniary benefit than they could possibly receive if he were living.   Such conduct in the trial of lawsuits has been so often condemned by the courts that it seems almost incredible that attorneys of reputable standing should still indulge in the practice.

HOOKER, J., concurred with GRANT, J.