MICHIGAN STATE UAW COMMUNITY ACTION PROGRAM
COUNCIL *v* SECRETARY OF STATE

OPINION OF THE COURT

1. CONSTITUTIONAL LAW—VOTER ROLLS—RIGHT TO VOTE—STATE IN-
TEREST—STATUTES.

Statute that removes otherwise qualified citizens from the voter
rolls clearly affects the right to vote; this right has always
received a preferred place in our constitutional system and
the importance of this right can hardly be overemphasized
because it is the basic protection that we have in insuring
that our government will truly be representative of all of
its citizens; in order that a state law prevail which impedes
this fundamental constitutional right, there must be demon-
strated a compelling state interest (Const 1963, art 2, § 1;
MCLA 168.509).

2. CONSTITUTIONAL LAW—VOTING—STATE INTEREST—STATUTES.

There are numerous legitimate reasons why a voter might not
vote, including illness, travel, absence of babysitters, or a
conscious protest against all of the candidates in a particular
election and since a statute effectively removes these voters
who are otherwise qualified under a constitutional provision,
there must be demonstrated by the Secretary of State a
compelling state interest (Const 1963, art 2, § 1; MCLA
168.509).

---

REFERENCES FOR POINTS IN HEADNOTES

[1–8] 25 Am Jur 2d, Elections § 53 *et seq.*
[9] 25 Am Jur 2d, Elections § 110.
[10] 25 Am Jur 2d, Elections § 95 *et seq.*
[11] 46 Am Jur 2d, Judges § 139.
[12, 13] 46 Am Jur 2d, Judges § 97 *et seq.*
[14, 15] 25 Am Jur 2d, Elections § 107.
[16] 25 Am Jur 2d, Elections § 96 *et seq.*
[17, 18] 25 Am Jur 2d, Elections § 45.
[19] 16 Am Jur 2d, Constitutional Law § 13.
[20] 25 Am Jur 2d, Elections § 104 *et seq.*
[21] 46 Am Jur 2d, Judges § 21 *et seq.*

3. Constitutional Law—Voters—Voting Lists—Registration of Voters—Compelling State Interest—Statutes.

Statute concerned with removing a certain class of voters, who are otherwise qualified under a constitutional provision, from the voting lists because of a failure to vote biennially or take other action required by a section of the statute is not concerned with voter registration; therefore, the state must demonstrate a compelling state interest to justify a law passed pursuant to this section of the constitution (Const 1963, art 2, § 1; MCLA 168.509).

4. Elections—Right to Vote—State Interest.

Any burden on the right to vote, however small, will not be permitted unless there is demonstrated a compelling state interest.

5. Elections—Right to Vote—Voter Fraud—State Interest—Statutes.

Statute, contended to insure that the voter rolls will not contain the names of voters who no longer live at the listed addresses and further would prevent other citizens from voting from such listed addresses, does to some extent accomplish the purpose of the prevention of voter fraud, but that is not sufficient to demonstrate a compelling interest; a statute that impinges on a preferred right in order to solve a legitimate and compelling governmental need must be precise in its regulation and the state has the burden of demonstrating that the particular regulation is necessary and essential and not achievable by less drastic means (MCLA 168.509).

6. Elections—Qualifications to Vote—State Interest.

The power of a state to determine qualifications to vote must be exercised precisely and circumspectly so as to limit the franchise no more than is necessary to effectuate the state's interest.

7. Constitutional Law—Elections—Right to Vote—Suspension —Voter Fraud—State Interest—Statutes.

Statute that provides for suspension of the registration of voters because of a failure to vote biennially or take other action required by a section of the statute is unconstitutional because the state has failed to demonstrate a compelling state interest; the statute's goal to prevent voter fraud can be accomplished by the use of statutes that provide that the clerk could send out letters to all persons who did not vote

once in two years with a request that the mail not be forwarded if the elector no longer resided in the municipality, and that the returned letter would be "reliable information" that the voter no longer resided in the municipality and his registration could be canceled; the asserted purpose of the first-mentioned statute would be accomplished without the disqualification of tens of thousands of otherwise qualified registered voters (Const 1963, art 2, § 1; MCLA 168.509, 168.513, 168.515).

DISSENTING OPINION

BLACK AND T. E. BRENNAN, JJ.

8. CONSTITUTIONAL LAW—REGISTRATION OF VOTERS—STATUTES—RIGHT TO VOTE.

*Michigan's two-year reregistration statute does not place an unconstitutional burden on the right to vote (MCLA 168.509).*

9. ELECTIONS—RECORD OF ELIGIBLE VOTERS—STATUTES.

*The legislature has found as a logical inference that the citizen who has failed to vote for two years—eschewing as many as ten consecutive opportunities to exercise his franchise—has probably moved and it has authorized and required election clerks to eliminate such stale registrations as one means of keeping an up-to-date record of eligible voters (MCLA 168.509).*

10. ELECTIONS—VOTER FRAUD—REGISTRATION OF VOTERS—QUALIFIED ELECTORS.

*The prevention of fraud is not the sole purpose of voter registration; orderly elections, convenience of the voters, accuracy of returns, public confidence in the electoral process, organization of precincts, preparation of ballots, employment of election workers, these and many other considerations all depend upon an up-to-date, reliable list of qualified electors.*

DISSENTING OPINION

BLACK, J.

See Headnotes 8–10.

11. JUDGES—PREJUDICE.

*Every judicial officer whose election, regardless of his partisan nomination, has come to pass under the pristine banner of constitutional nonpartisanship whenever if at all he is unavoidably required to decide a political issue that is bound*

*to affect in any way his own continued tenure or standing with his own political party, should firmly cast aside those connections and beliefs in favor of that which is* juris judicial; *not* partisan prejudicial.

12. C<span style="font-variant:small-caps">ONSTITUTIONAL</span> L<span style="font-variant:small-caps">AW</span>—D<span style="font-variant:small-caps">UE</span> P<span style="font-variant:small-caps">ROCESS</span>—F<span style="font-variant:small-caps">AIR</span> T<span style="font-variant:small-caps">RIAL</span>—F<span style="font-variant:small-caps">AIR</span> T<span style="font-variant:small-caps">RIBU-</span> <span style="font-variant:small-caps">NAL</span>—J<span style="font-variant:small-caps">UDGES</span>—B<span style="font-variant:small-caps">IAS</span>.

*A fair trial in a fair tribunal is a basic requirement of due process; fairness of course requires an absence of actual bias in the trial of cases, but our system of law has always endeavored to prevent even the probability of unfairness; to this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.*

13. J<span style="font-variant:small-caps">UDGES</span>—D<span style="font-variant:small-caps">ISQUALIFICATION</span>—S<span style="font-variant:small-caps">UPREME</span> C<span style="font-variant:small-caps">OURT</span>—C<span style="font-variant:small-caps">OURT OF</span> A<span style="font-variant:small-caps">PPEALS</span> —R<span style="font-variant:small-caps">EGISTRATION OF</span> V<span style="font-variant:small-caps">OTERS</span>—C<span style="font-variant:small-caps">ONSTITUTIONAL</span> L<span style="font-variant:small-caps">AW</span>.

*Michigan Supreme Court Justices should disqualify themselves peremptorily as having either "an interest in the outcome" or the "appearance" of such an interest in a mandamus action challenging the constitutionality of the two-year reregistration of voters statute; that should be done in favor of submission to and final judgment by Michigan's wholly nonpartisan Court of Appeals, sitting* en banc *to be effected by a specific order of assignment of the judges of that Court to Supreme Court duty pursuant to the final sentence of a section of the judicial article of the Michigan Constitution (Const 1963, art 6, § 23; MCLA 168.509).*

14. E<span style="font-variant:small-caps">LECTIONS</span>—R<span style="font-variant:small-caps">EGISTRATION OF</span> V<span style="font-variant:small-caps">OTERS</span>—R<span style="font-variant:small-caps">ESIDENCE</span>—C<span style="font-variant:small-caps">ONSTITU-</span> <span style="font-variant:small-caps">TIONAL</span> L<span style="font-variant:small-caps">AW</span>—S<span style="font-variant:small-caps">TATUTES</span>.

*Many an urban registrant changes his residence so regularly as to verify the consummate wisdom of the two-year reregistration of voters statute's compliance with the constitutional mandate that "[t]he legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting" (Const 1963, art 2, § 4; MCLA 168.509).*

15. E<span style="font-variant:small-caps">LECTIONS</span>—R<span style="font-variant:small-caps">EGISTRATION OF</span> V<span style="font-variant:small-caps">OTERS</span>—C<span style="font-variant:small-caps">ONSTITUTIONAL</span> L<span style="font-variant:small-caps">AW</span>— S<span style="font-variant:small-caps">TATUTES</span>—R<span style="font-variant:small-caps">ESIDENCE</span>—E<span style="font-variant:small-caps">VIDENCE</span>.

*The two-year reregistration of voters statute is a patently effective reinforcement of the Michigan constitutional directive that a voter should meet "the requirements of local residence provided by law", it provides convincing evidence*

*of a valid legislative effort to comply with the mandate of a section of that Constitution to provide a "system of voter registration and absentee voting", and it is bound if administered per the intent of that section of the Constitution to deter "abuses of the elective franchise"; it would be difficult to obtain better evidence that a registered voter has changed his residence, from that set forth in his registration, than inability of the postman to deliver his notice of suspension of registration as provided in that statute (Const 1963, art 2, §§ 1, 4; MCLA 168.509).*

16. ELECTIONS — MANDAMUS — ACTIONS — CONSTITUTIONAL LAW — REGISTRATION OF VOTERS.

*Plaintiffs' and any canceled registrant's challenge to the constitutionality of a two-year reregistration of voters statute is nonactionable for want of any showing that Michigan has in fact precluded plaintiffs from voting; there is no pretense that any citizen of Michigan, being eligible by Constitution and statute, may not for Michigan's upcoming primary and general elections register or reregister himself during the next few months, by any choice of the ways that are provided in our election code; it is not the right to vote that is at stake here but a claimed right to have party-relief from registration drives every four years (MCLA 168.491 et seq., 169.509).*

17. ELECTIONS—REGISTRATION OF VOTERS—ADMINISTRATIVE LAW— EXHAUSTION OF REMEDIES—MANDAMUS—STATUTES.

*There is an adequate administrative remedy for the wrong claimed by plaintiffs, who sought a writ of mandamus to challenge the constitutionality of a two-year reregistration of voters statute, the exhaustion of which they must first plead and prove where any otherwise eligible citizen and every registrant whose registration has been suspended by statute may conveniently register or reregister prior to that 30-day period preceding the primary election day, or if not then, at any time prior to that 30-day period that precedes the general election day (MCLA 168.509).*

18. EQUITY—JURISDICTION—ADMINISTRATIVE LAW—EXHAUSTION OF REMEDIES.

*A solidly established rule of equity jurisdiction is that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.*

19. Constitutional Law—Laws—Treaties—States.

*The Constitution, laws and treaties of the United States are as much a part of the laws of every state as its own local laws and constitution.*

20. Elections—Registration of Voters—Residence—Constitutional Law—Statutes.

*United States Supreme Court decision of March 21, 1972, actually amends a section of the Michigan Constitution and a section of the election code, reducing the requirement of 6 months residence as a condition of registration for voting to 30 days (Const 1963, art 2, § 1; MCLA 168.492).*

21. Judges—Canons.

*Judicial Canon 14, which provides "[a] judge should not be swayed by partisan demands, public clamor or considerations of personal popularity or notoriety, nor be apprehensive of unjust criticism", is the very soul of the judicial process; it applies exclusively to the judicial branch (Judicial Canon 14).*

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and J. H. Gillis and V. J. Brennan, JJ., dismissing complaint for a writ of mandamus against the Secretary of State. Submitted January 4, 1972. (No. 4 January Term 1972, Docket No. 53,635.) Decided June 20, 1972.

Original complaint in Court of Appeals by Michigan State UAW Community Action Program Council and others against the Secretary of State for a writ of mandamus to challenge the constitutionality of a two-year reregistration of voters statute. Plaintiffs' motion for an order to show cause denied and complaint dismissed. Plaintiffs appeal. Reversed, mandamus to issue and injunction granted.

*Rothe, Martson, Mazey, Sachs, O'Connell, Nunn & Freid,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Russell A. Searl*

and *Charles S. Alpert,* Assistants Attorney General, for defendant.

SWAINSON, J.  Plaintiffs filed complaint for a writ of mandamus in the Court of Appeals on behalf of themselves and on behalf of a class of persons similarly situated, to challenge the constitutionality of MCLA 168.509; MSA 6.1509.  That section provides:

"During the month of December in each year, the clerk shall examine the registration records and shall suspend the registration for all electors who have not voted, continued their registration, reinstated their registration, or recorded a change of address on their registration within a period of 2 years.  Each such elector shall be sent a notice through the mails substantially as follows:
" * * * [Form]
"After the expiration of 30 days, the clerk shall cancel the registrations of all electors thus notified who have not applied for continuations.  A proper entry shall be made on the registration card of each elector whose registration is canceled.  Any elector whose registration has been canceled may have his registration reinstated under the same qualifications required at the time of the initial registration, in which case the clerk shall note the reinstatement date on the applicant's former registration card, affix his signature thereto and replace both the precinct and master cards in the active files, or a new set of cards may be executed in connection with such reinstatement.  A reinstated registration shall be valid for the same period as a new registration."

Plaintiffs allege this section violates Const 1963, art 2, § 1, and the Due Process and Equal Protection Clauses of both the United States[1] and Michigan[2]

---

[1] "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United

Constitutions. The Court of Appeals, on August 16, 1971, denied plaintiffs' motion for an order to show cause for lack of merit on the grounds presented, and dismissed the complaint. Judge VINCENT J. BRENNAN in dissenting would have treated the matter as an application for leave to appeal and granted same. We granted leave to appeal. 386 Mich 760.

In view of our disposition of the case, we will deal with only one issue: Whether MCLA 168.509; MSA 6.1509, violates Const 1963, art 2, § 1, by imposing a further qualification for voting in addition to those qualifications exclusively provided therein?

Const 1963, art 2, § 1, provides:

"Every citizen of the United States who has attained the age of 21 years,[3] who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes."

States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV, § 1.

[2] "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation." Const 1963, art 1, § 2.

"No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed." Const 1963, art 1, § 17.

[3] Under the 26th Amendment to the United States Constitution, this has been changed to 18 years.

MCLA 168.509; MSA 6.1509, by removing otherwise qualified citizens from the voter rolls clearly affects the right to vote. The right to vote has always received a preferred place in our constitutional system. The importance of this right can hardly be overemphasized. It is the basic protection that we have in insuring that our government will truly be representative of all of its citizens.[4] The United States Supreme Court has held in numerous recent decisions involving the right to vote that in order that a state law prevail which impedes this fundamental constitutional right, there must be demonstrated a compelling state interest. *Williams v Rhodes,* 393 US 23; 89 S Ct 5; 21 L Ed 2d 24 (1968); *Kramer v Union Free School Dist,* 395 US 621; 89 S Ct 1886; 23 L Ed 2d 583 (1969); *Cipriano v Houma,* 395 US 701; 89 S Ct 1897; 23 L Ed 2d 647 (1969); *Evans v Cornman,* 398 US 419; 90 S Ct 1752; 26 L Ed 2d 370 (1970); and *Phoenix v Kolodziejski,* 399 US 204; 90 S Ct 1990; 26 L Ed 2d 523 (1970). Our Court has recently applied this standard in *Wilkins v Ann Arbor City Clerk,* 385 Mich 670 (1971), a case involving the voting rights of students. Thus, in order to uphold MCLA 168-.509; MSA 6.1509, we must determine whether there is demonstrated a compelling state interest.

In *Beare v Smith,* 321 F Supp 1100, 1102–1103 (SD Tex, 1971), a three-judge Federal district court struck down the Texas system of annual reregistration which closed registrations some eight months in advance of the elections. The court stated:

---

[4] The United States Supreme Court has long recognized the importance of the right to vote in our constitutional system. See, *Yick Wo v Hopkins,* 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886); *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964); *Wesberry v Sanders,* 376 US 1; 84 S Ct 526; 11 L Ed 2d 481 (1964).

"At the outset, it must be said that the right to vote is a right which is at the heart of our system of government. *Parenthetically, it must be said that there is also a right not to vote.* The really important aspect of this problem is that any restrictions on or impediments to this right should be legislatively imposed solely and only to protect a compelling state interest and any other restrictions on or impediments to this right cannot meet constitutional standards." (Emphasis added.)

As plaintiffs point out, there are numerous legitimate reasons why a voter might not vote, including illness, travel, absence of babysitters, or a conscious protest against all of the candidates in a particular election. Since MCLA 168.509; MSA 6.1509, effectively removes these voters who are otherwise qualified under Const 1963, art 2, § 1, there must be demonstrated by the defendant a compelling state interest.

The Attorney General contends that MCLA 168.509; MSA 6.1509, is authorized under Const 1963, art 2, § 4, which provides in pertinent part:

"The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States. *The legislature shall enact laws to preserve the purity of elections,* to preserve the secrecy of the ballot, *to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.*" (Emphasis added.)

The authority of the Legislature to set up a system of voter registration is not in question.[5] How-

---

[5] *Common Council of Detroit* v *Rush*, 82 Mich 532 (1890); 25 Am Jur 2d, Elections § 96, fn 17, p 784; *Brown* v *Kent County Election Commissioners,* 174 Mich 477 (1913).

ever, any law passed pursuant to this constitutional authority does place a burden on the right to vote. Moreover, MCLA 168.509; MSA 6.1509, is not concerned with voter registration, but, rather with removing a certain class of otherwise qualified voters under Const 1963, art 2, § 1, from the voting lists because of a failure to vote biennially or take other action required by the section. Therefore, the state still must demonstrate a compelling state interest to justify a law passed pursuant to this section. The Attorney General cites *Simms* v *County Court of Kanawha County,* 134 W Va 867; 61 SE2d 849 (1950), and *In re Freeholders of Hudson County,* 105 NJL 57, 143 A 536 (1928), for the authority of the legislature to set up a system of registration and to cancel registration for nonvoting. These cases all applied the "reasonableness" test rather than the compelling state interest test and, thus, are not applicable to this case.[6]

The Attorney General also contends that because the statute allows any elector to return an application for reregistration that, "This indeed is a small price to pay to guard against abuses of the elective franchise". Any burden, however small, will not be permitted unless there is demonstrated a compelling state interest. *Lane* v *Wilson,* 307 US 268; 59 S Ct 872; 83 L Ed 1281 (1939); *Williams* v *Rhodes, supra; Wilkins* v *Ann Arbor City Clerk, supra,* pp 684–685. In addition, the fact that over 600,000 persons were purged in Detroit alone from 1960 to 1970 demonstrates that MCLA 168.509; MSA

---

[6] *McDonald* v *Board of Election Commissioners,* 394 US 802; 89 S Ct 1404; 22 L Ed 2d 739 (1969), also cited by the Attorney General, involved the failure of an Illinois statute to provide absentee ballots for inmates of the Cook County jail who were awaiting trial on nonbailable offenses. This case is clearly distinguishable on its facts.

6.1509, is indeed a serious impediment on the right to vote for a substantial number of citizens.[7]

The state contends that it has a compelling interest in the prevention of voter fraud. It contends that MCLA 168.509; MSA 6.1509, insures that the voter rolls will not contain the names of voters who no longer live at the listed addresses and further would prevent other citizens from voting from such listed addresses. It cannot be doubted that the above section does to some extent accomplish this purpose, but that is not sufficient to demonstrate a compelling interest. A statute that impinges on a preferred right in order to solve a legitimate and compelling governmental need must be precise in its regulation. *United States* v *Robel,* 389 US 258, 265; 88 S Ct 419; 19 L Ed 2d 508 (1967); *NAACP* v *Button,* 371 US 415, 438; 83 S Ct 328; 9 L Ed 2d 405 (1963). The state has the burden of demonstrating that the particular regulation is necessary and essential and not achievable by less drastic means. *Shapiro* v *Thompson,* 394 US 618, 637; 89 S Ct 1322; 22 L Ed 2d 600 (1969). As the court stated in *Beare* v *Smith, supra,* p 1106:

"It must always be kept in mind that the power of a state to determine qualifications to vote must be exercised precisely and circumspectly so as to limit the franchise no more than is necessary to effectuate the state's interest. *United States* v. *Alabama,* 252 F. Supp. 95 (M.D. Ala. 1966)."

The Michigan Legislature has passed a comprehensive set of safeguards to prevent fraudulent voting. Under sections 493, 495 and 499 of the Michigan Election Law (MCLA 168.493, 168.495 and 168.499; MSA 6.1493, 6.1495 and 6.1499) detailed registration data is required and the registrant must declare his

---

[7] Figures supplied by Detroit election clerk and accepted by both parties.

qualifications under oath, the violation of which is punishable as a misdemeanor. Under section 505 (MCLA 168.505; MSA 6.1505) when an elector applies for registration, the clerk has the duty of ascertaining if the elector is already registered elsewhere in Michigan and if so, the clerk has the elector sign an authorization to cancel his previous registration. Specifically, this is intended to prevent the problem of dual voting.

Under section 510 (MCLA 168.510; MSA 6.1510) the county clerk is required to forward a list of the names of all persons who have died within the county to the clerk of each city or township in the county, and the respective city and township clerks are authorized to cancel the registrations of deceased electors. Specifically, this is intended to prevent fraudulent voting by the use of names of deceased electors. Section 514 (MCLA 168.514; MSA 6.1514) provides for the physical cancellation of registration cards when registrations are cancelled and the destruction of such cards by burning.

Under section 519 (MCLA 168.519; MSA 6.1519) the clerk is prohibited from registering persons known or believed by him to be unqualified, and the violation of this duty is made a misdemeanor. Under section 520 (MCLA 168.520; MSA 6.1520) the clerk is authorized and required to investigate probable illegal or fraudulent registration. Also, under this section, he is authorized to call upon the police or sheriff to aid in such investigation. Under section 521 (MCLA 168.521; MSA 6.1521) the clerk is required to remove names improperly registered. Moreover, before an elector is allowed to vote on an election day, he must identify himself by executing an application to vote showing his signature and address of residence and,

"The election official in charge of the precinct registration file shall compare the signature upon such application with the signature upon the registration card, and if the same do not correspond the vote of such person shall be challenged and the same procedure shall be followed as provided in the election law for the challenging of electors." MCLA 168.523; MSA 6.1523.

The cited sections of the Michigan Election Law might in themselves be sufficient to rebut defendant's assertions that MCLA 168.509; MSA 6.1509, is necessary to prevent fraud.[8] However, the same goal desired by MCLA 168.509; MSA 6.1509, can be accomplished by the use of only sections 513 and 515 (MCLA 168.513 and 168.515; MSA 6.1513 and 6.1515). These sections provide:

"Sec. 515.     The several township city and village clerks may conduct a house-to-house canvass *or use such other means of checking the correctness of registration records as may seem expedient.*" (Emphasis added.)

"Sec. 513.     Upon receipt of reliable information that a registered elector has moved away from the municipality, the clerk shall notify such elector through the mail at his registered address, stating the source of the information, and if the elector does not apply for continuation of registration within 30 days, his registration shall be cancelled."

Under section 515 (MCLA 168.515; MSA 6.1515), the clerk could send out letters to all persons who did not vote once in two years with a request that the mail not be forwarded if the elector no longer

---

[8] Indeed, it can hardly be contended that a provision similar to section 509 (MCLA 168.509; MSA 6.1509) is indispensable to prevent fraud since defendant concedes that ten states, Alabama, Connecticut, Maine, Massachusetts, Mississippi, Missouri, New Hampshire, North Carolina, Oregon and Virgina, do not cancel registration for nonvoting.

resided in the municipality. Under section 513 (MCLA 168.513; MSA 6.1513), the returned letter would be "reliable information" that the voter no longer resided in the municipality and his registration could be cancelled. The asserted purpose of section 509 (MCLA 168.509; MSA 6.1509) would be accomplished without the disqualification of tens of thousands of otherwise qualified registered voters.

Thus, we hold that the state has failed to demonstrate a compelling state interest and that MCLA 168.509; MSA 6.1509, is unconstitutional under Const 1963, art 2, § 1. The order of the Court of Appeals is reversed and a writ of mandamus against the purging of voters under said section 509 (MCLA 168.509; MSA 6.1509) shall issue. The temporary injunction entered by order of the Court on December 17, 1971, enjoining election clerks generally from applying the provisions of said section 509 (MCLA 168.509; MSA 6.1509), shall be made permanent. No costs, a public question being involved.

T. M. Kavanagh, C. J., and Adams, T. G. Kavanagh, and Williams, JJ., concurred with Swainson, J.

T. E. Brennan, J. (*dissenting*). I cannot agree with the conclusion that Michigan's two-year reregistration statute places an unconstitutional burden on the right to vote.

The citizen who fails to vote, despite his right to vote by absentee ballot, for a period of two years, misses one or two general elections, one or two primary elections and an undetermined number of municipal primary and general elections, special elections, school elections, village elections and the like.

My Brother suggests that such long continued estrangement from the exercise of the franchise could easily be laid to illness, travel, lack of baby-sitters, or conscious protest against the candidates.

The first three grounds would entitle the voter to an absentee ballot. And the blank space provided for write-in candidates invites conscious protest.

The Legislature has found as a logical inference that the citizen who has failed to vote for two years —eschewing as many as ten consecutive opportunities to exercise his franchise—has probably moved.

That inference is logical. It is common sense. It comports with the experience of people in our highly mobile society.

The Legislature has authorized and required election clerks to eliminate such stale registrations as one means of keeping an up to date record of eligible voters.

What is this unconstitutional burden which is allegedly placed upon the franchise?

My Brother, with printers' ellipsis, omitted from his statutory quotation the following notice, required to be given voters before their names are removed from the rolls; (MCLA 168.509; MSA 6.1509):

### "NOTICE OF SUSPENSION OF REGISTRATION

"You are hereby notified that your registration as a qualified elector will be canceled according to state law, for having failed to vote, to continue or reinstate your registration or to record a change of address within the past 2 years unless you apply for a continuation within 30 days from this date. You may continue your registration by signing the statement below and returning it to this office or by applying in person.

"APPLICATION FOR CONTINUATION
OF REGISTRATION

"I hereby certify that I reside at the address given below and apply for continuation of my registration as a voter.  My mother's maiden name was

. . . . . . . . . . . . . . . . . . . . . . . . .

    "Signature of elector . . . . . . . . . . . . . . . . . . . . . . .
    "Present resident address . . . . . . . . . . . . . . . . . . . ."

Sign and return.  Even the paper is supplied. The voter must write down his mother's maiden name, and his own name and address.  That much penmanship is equally required at the polling place on election day.

Address an envelope and send it to the clerk.  If that be an unconscionable burden upon the franchise, what of the need to apply for an absent voter's ballot, or the need to stand in line at the polling place?

My Brother concedes that Michigan has a "compelling state interest" in maintaining an accurate up to date registry of qualified voters.

The issue here then is not whether Michigan has a compelling state interest—but whether its conceded interest is properly served by the cancellation of registrations for nonvoting.

*Beare* v *Smith,* 321 F Supp 1100 (SD Tex, 1971), relied upon by my Brother was not a case involving cancellation for nonvoting.  Unlike Michigan, Texas required annual registration.

The Attorney General's brief quotes from *Beare*:

"It is beyond doubt that the present Texas voter registration procedures tend to disenfranchise multitudes of Texas citizens otherwise qualified to vote. The present system, being a direct descendant of the poll tax, Gonzales v. Steven, 427 S.W.2d 694 (Tex. Civ. App.—Corpus Christi 1968, n.r.e.), has

all of the features which the poll tax system had
except the payment of an annual fee.   The closing
of registration so far in advance of the general elec-
tion, in the years one is held, perpetuates the obsta-
cles the twenty-fourth amendment prohibits.   The
evidence presented in this case shows that if the
annual registration obstacle were removed over one
million Texans would be eligible to vote that would
not have been eligible with that requirement.   With-
out annual registration, the number of persons who
would actually vote would be increased by about the
same number.   Similarly, if registration were open
until a month before the general election and had
been open for the preceding eight months, voter
registration would increase by over one million.   In
short, the present system closes the election hall
door to a million citizens."

About the only similarity between *Beare* v *Smith,*
*supra,* and the case before this Court is the fact
that both cases have something to do with elections.

The fact is that Michigan is one of 37 states
maintaining permanent registration systems which
provide for cancellation after a designated period
of nonvoting.

The majority opinion makes an illusory argument.

It asserts that the purpose and sole justification
for nonvoter cancellation lies in the state's interest
in preventing fraud.

It then proceeds to argue that cancellation for
nonvoting is not necessary to prevent fraud.

But the prevention of fraud is not the sole pur-
pose of voter registration.   Orderly elections, con-
venience of the voters, accuracy of returns, public
confidence in the electoral process, organization of
precincts, preparation of ballots, employment of
election workers; these and many other considera-

tions all depend upon an up to date, reliable list of qualified electors.

"Voter fraud" as envisioned in the majority opinion could be prevented *without any registration of electors whatsoever.* (Consider the expediency of photographing or fingerprinting every citizen who offers to vote and prosecuting those who vote twice.)

An underlying problem here is that there are a substantial number of our citizens who are not merely mobile—they are more aptly described as migrant or itinerant.

Much of the social legislation of this century has been aimed at reducing that unfortunate condition. Housing, jobs and similar public concerns are related to it. The Model Cities and Model Neighborhood programs; the decentralization of schools and other current developments and programs are all part of a wider effort to bring a sense of community to those who have for too long been subjected to rootless anonymity in the vast heartland of our cities.

That constituency will not be well served by what we do today. True, the resources of the plaintiff organizations will be relieved of the burden of periodic registration drives. But it cannot be supposed that such organizations will henceforth be indifferent to the matter of "getting out the vote".

Plaintiffs' brief suggests that citizens can, and often do, vote where they do not live. Our decision today will exacerbate that problem; it presages the day of central registration, factory gate and supermarket ballot boxes.

In these days when the young, the disenchanted, the ignored and the used are demanding more self determination, our decision is retrogressive.

Neighborhood voting is a long standing American tradition deeply rooted in our concepts of personal freedom and independent citizenship.

This is hardly the time to encroach upon that tradition by lumping city voters together and treating them as interchangeable, temporary inhabitants of interchangeable indistinguishable urban neighborhoods.

BLACK, J., concurred with T. E. BRENNAN, J.

BLACK, J. (*dissenting*). I agree with the dissenting opinion Justice T. E. BRENNAN has prepared. It is endorsed accordingly. More however must be said. This visibly partisan decision of a majority of the Justices, all here by favor of the plaintiff Democratic Party and the other plaintiffs listed above, to butcher-cleave from Michigan's election code one of her most potent safeguards "against abuses of the elective franchise",[1] simply has to be challenged. In a grim word, I mean to share no responsibility for any judicial action that opens the door ever wider for fraud on election day.

Upon this last remark let us be off to Donnybrook with partisan petticoats exposed daintily behind a majority of the black robes. As we go it will not take the viewer of our parade long to perceive that what is actually involved, and is thus due for test, has to be our own Judicial Canon 14, headed "Independence". Its stern command to this party-nominated Court, for application to this partisan instigated action, is that "A judge should not be

---

[1] As before (Const 1850, art 7, § 6; Const 1908, art 3, § 8), § 4 of article 2 mandates, by its second sentence:

"The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting."

swayed by partisan demands, public clamor or considerations of personal popularity or notoriety, nor be apprehensive of unjust criticism".

A half century ago another disgusted judge of another appellate court wrote another caustic protest against partisan-judicial action favoring what surely must have been another complaint for mandamus signed "Democratically yours".[2] That protest provides a fitting introduction to the ensuing message of dissent; a message which, pretending no politesse, opposes abject judicial surrender to an admittedly powerful political party and its most eminent leaders and adherents.

The judicial officer referred to, Judge Higbee of the Supreme Court of Missouri, wrote one of the three minority opinions of *State ex rel Lashly* v *Becker,* 290 Mo 560; 235 SW 1017 (1921). He opened his independent review of earlier decisions of his Court with these words (p 625):

"Perhaps we may better understand the majority opinion, running, as it does, counter to all the canons of construction (except in emergencies like the present), by referring to a few of our earlier decisions in political cases. *Shackled as we are with partisan bias and prejudice, it is humiliating to confess that even judges in our highest courts are unable to divorce law and politics. In emergencies, great and small, they have heard the Macedonian cry, and have not been disobedient to the call."* (Emphasis by present writer.)

Then, going on to examine the Missouri cases he had in mind, Judge Higbee pointed to the curious fact "that in each instance the Republican was ousted". (p 630.) His conclusion (p 1043):

---

[2] He wrote, of course, before Missouri yanked her Supreme Court out of partisan politics and installed the now well known "Missouri Plan" of judicial selection and tenure.

"If we now overrule that ["the Halliburton Case"[3]] and other cases in the face of a political exigency, may it not be said that the political game was simply transferred to this court? The premises considered, can we adopt the majority opinion and hope to merit the confidence and respect of our people? Of course this court has the power to arbitrarily override the Constitution, but I solemnly protest against this monstrous wrong. *When it is apparent that our rulings are tossed about like a football to meet political exigencies, we shall justly merit public contempt."* (Emphasis by present writer.)

Yes, we of this Court are hearing that same Macedonian cry; just as we are hearing it drumfired for the related and presently identified *Legislative Apportionment proceeding.* Three of us yet here (all Democratic nominees to the Court by the way) heard its fearsome clangor when *In re Apportionment of State Legislature,* 377 Mich 396 (1966) came to a final "'decision' by impasse" (377 Mich 416), for the then remainder of the constitutional decade which by judicial action is due to end this year.

But not *all* yielded to that cry. I do not now, as these concededly futile presents[4] curtly demonstrate. No matter what our partisan connections and beliefs may have been prior to tenure here, I consider it a matter of strictly unswerving duty that every one of us, whenever if at all he is *unavoidably* required to decide a political issue that is bound to affect in

---

[3] *State ex rel Halliburton* v *Roach,* 230 Mo 408; 130 SW 689; 139 Am St Rep 639 (1910); referred to regularly by all judges writing in *State* v *Becker.*

[4] At this writing (March 30) the Court, galvanized as by a hot wire, has already issued its writ granting these plaintiffs all of the political relief they seek. See order dated March 10, 1972, fully quoted *post* at p 550 (appendix).

*any* way his own continued tenure or standing with his own political party, should firmly cast aside those connections and beliefs in favor of that which is *juris judicial;* not *partisan prejudicial.* Surely that holds true of every judicial officer whose *election,* regardless of his *partisan nomination,* has come to pass under the pristine banner of *constitutional nonpartisanship.*

*First: Is this Court eligible to determine the pleaded cause, now that the partisan purpose of that cause has been revealed?*

We review here the summary dismissal, by Division 1 of the Court of Appeals, of a complaint for mandamus to compel a political result of manifest advantage to and for the Democratic Party of Michigan. It is brought by the most formidably powerful units and leaders of that party, headed by the Michigan State UAW Community Action Program Council (CAP), the Michigan State Conference of NAACP Branches, the Michigan State AFL-CIO, *the Michigan Democratic Party itself,* plus all of the politically potent leaders and representatives of that party. It is brought to review before an appellate court *consisting of six of seven Justices who owe their judicial nominations and hence their respective tenures to that same party.* Four of those Justices are bound to benefit—directly and politically—from the decision criticized here; the upcoming 1972, 1974 and 1976 Democratic nominations and endorsements to this Court considered.

The action is brought against the Secretary of State, himself a Democratic nominee to that office. It is defended by an Attorney General *whose original appointment to that office was made by the writer of the instant majority opinion;* whose ensuing nominations to that office are owed to the plain-

tiff Democratic Party; one whose hand of gentle restraint surely reposes on the shoulder of the able assistant he assigned to its defense.  And the distinctly perceivable purpose of the action is to *relieve by judicial fiat the Democratic Party of that party's hitherto voluntarily undertaken burden;* the burden of *getting back on the registration lists* the names of "all electors who have not voted, continued their registration, reinstated their registration, or recorded a change of address on their registration within a period of 2 years."[5]

The action is the kind that tries with cold steel both the conscience and the rectitude of every Justice, each of us upon oath having undertaken in the name of constitutional due process that which *Tumey* v *Ohio,* 273 US 510, 532; 47 S Ct 437; 71 L Ed 749; 50 ALR 1243 (1927)[6] described as the duty "to hold the balance nice, clear and true  *  *  *  ". As ruled unanimously in *In re Murchison,* 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955), reversing 340 Mich 140 and 340 Mich 151:

"A fair trial in a fair tribunal is a basic requirement of due process.  Fairness of course requires an absence of actual bias in the trial of cases.  But our system of law has always endeavored to prevent even the probability of unfairness.  To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.  That interest cannot be defined with precision.  Circumstances and relationships must

[5] The quotation is taken from the premisory paragraph of instantly attacked section 509 of the general election law.  The entire section is quoted *post* at p 534.

[6] Followed in and applied to *Glass* v *State Highway Commissioner,* 370 Mich 482, 487 (1963); a condemnation case where special deputy state highway commissioner Hart was held disqualified to judge the presented issue of necessity on ground of "interest" in the result.

be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' *Tumey* v *Ohio,* 273 US 510, 532 [71 L Ed 749, 758; 47 S Ct 437; 50 ALR 1243]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt* v *United States,* 348 US 11 [99 L Ed 11; 75 S Ct 11 (1954)]."

Sir Winston Churchill, speaking in the House of Commons November 12, 1940, provided special respect for these high ideals:

"The only guide to a man is his conscience; the only shield to his memory is the rectitude and sincerity of his actions."

So did Chief Justice John Marshall in the course of the Virginia Debates (quoted in *O'Donoghue* v *United States,* 289 US 516, 532; 53 S Ct 740; 77 L Ed at 1361 [1933]):

"The Judicial Department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. *Is it not, to the last degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience?"* (Emphasis by present writer.)

In and for this partisan action as well as the equally partisan *Legislative Apportionment* proceeding of 1972, we should disqualify ourselves peremptorily as having either "an interest in the outcome" or the "appearance" of such an interest. That should be done in favor of submission to and final

judgment for both cases by Michigan's wholly non-partisan Court of Appeals[7] (sitting *en banc* of course), same to be effected by a specific order of assignment of the Judges of that Court to Supreme Court duty pursuant to the final sentence of 1968 amended § 23 of the judicial article of the Constitution:

"The supreme court may authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments."

For the mentioned *Legislative Apportionment* proceeding I have written more for this principle of automatic self-disqualification of any Court to determine an issue where bias—or any appearance of bias—of that Court is widely known. Now however, definitely by the *fait accompli* of the presently discussed order of March 10 last, we are due for the reverse of that discreet professional imprecation of the 40's, 50's and most of the 60's, when Republican nominees dominated this Court. Then it was muttered, generally and justifiably, that "The Court opens and closes on motion of General Motors". From here on it is bound credibly to be that "The Court opens and closes on motion of the CIO".

No Justice can honestly deny this, or say loftily that he knows naught of what every veteran observer of the Court knows. As written only last year for *Wilkins* v *Ann Arbor City Clerk,* 385 Mich 670, 691 (1971), quoting Mr. Justice Field:

"Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. When we

---

[7] "The court of appeals shall consist initially of nine judges who shall be nominated and elected at non-partisan elections from districts drawn on county lines and as nearly as possible of equal population, as provided by law." (Const 1963, art 6, § 8.)

take our seats on the bench we are not struck with blindness and forbidden to know as judges what we see as men."

Since public release of the Court's order dated March 10[8] Michigan's daily of greatest circulation, The Detroit News, has put an errorless finger on its partisan nature. Far from being interlocutory, that order has already granted to the plaintiff Democrats all relief demanded by them *and has actually decided the case*. The order seems to have been prepared as to form late on March 10 Friday, but withheld from public knowledge pending communication of its content to the plaintiff Democratic organizations. The writer and Justice T. E. Brennan had to learn (exclusively through the news media on Tuesday, March 14) not only the exact content of but also the fact of public release of the order on the previous day, *plus the fact of its previous submission to the plaintiff Democratic organizations*. Now why, but for check and approval, was the order submitted *first* to the plaintiffs? The Detroit News told the unseemly story March 14 (p 3A):

"President Nixon and U. S. Senator Robert P. Griffin are the likely eventual big losers under a new order by the Michigan Supreme Court.

"An estimated 500,000 persons who would have been ineligible to vote because of 'dead' voter registrations now will be able to cast ballots.

[8] See the appendix for a complete copy of the order. Its windup paragraph:

"It is further Ordered that all registrations heretofore cancelled or held in abeyance on or after December 1970 pursuant to Section 509 of the Michigan Election Law shall, for all purposes, be considered and treated as reinstated."

Compare this with the Court's minutes of voted action on March 9:

"Motion by Justice Adams, supported by Justice Williams, that the petition of plaintiffs-appellants [Mich State UAW *et al*] for an amendatory injunction be granted. Motion carried, Justices Black, Brennan and Swainson dissenting."

"Democratic leaders figure at least 70 percent of the unregistered at any time—whatever the reason—are Democrats. That means an addition of perhaps 350,000 in their column to only 150,000 for the Republicans, and the 200,000 difference could be crucial to Mr. Nixon's carrying the state or Griffin's reelection this year.

*"The court order was issued late Friday but not made public until the word had spread through Democratic channels."* (Emphasis by present writer.)

To the fully deserved shame of the Court, next came that gut critique by the News' lead editorial of March 15. The masthead of that editorial dubbed the order, quite properly, an "Invitation to Fraud":

"The court's strange ruling has with good reason raised political eyebrows in this state. The facts of the matter speak eloquently for themselves:

"First, Democrats sought to void the registration law and had a strong political interest in the outcome.

"Second, most of the estimated 500,000 names restored to the registration rolls are those of Democrats—which theoretically will give Democratic candidates an advantage in forthcoming elections.

"Third, all the signers of the Supreme Court order are Democrats. Only one Democrat, John Swainson, dissented along with the court's lone Republican and its lone independent.

"Fourth, although the court actually issued its order last Friday, and although the news spread immediately through Democratic channels, the public wasn't let in on the secret until Monday."

Sadly, the handling of that March 10 order is just more proof of partisan-shackled inability of our Democratic-nominated majority to provide for the people of Michigan that "fair trial in a fair tribunal" of the power of Michigan's legislators to

legislate, as they have done by section 509, pursuant to the mandates of §§ 1 and 4 of the second article; always bearing in mind that that majority has chosen to decide the appealed issue on non-Federal ground.[9]

*Second: What believable merit accompanies this partisan attack upon section 509?*

Section 509 reads *in full* (MCLA 168.509; MSA 6.1509):

"During the month of December in each year, the clerk shall examine the registration records and shall suspend the registration for all electors who have not voted, continued their registration, reinstated their registration, or recorded a change of address on their registration within a period of 2 years. Each such elector shall be sent a notice through the mails substantially as follows:

"NOTICE OF SUSPENSION
OF REGISTRATION

"You are hereby notified that your registration as a qualified elector will be canceled according to state law, for having failed to vote, to continue or reinstate your registration or to record a change of address within the past 2 years unless you apply for a continuation within 30 days from this date. You may continue your registration by signing the statement below and returning it to this office or by applying in person.

"APPLICATION FOR CONTINUATION
OF REGISTRATION

"I hereby certify that I reside at the address given below and apply for continuation of my registra-

_____

[9] "In view of our disposition of the case, we will deal with only one issue: Whether MCLA 168.509; MSA 6.1509, violates Const 1963, art 2, § 1, by imposing a further qualification for voting in addition to those qualifications exclusively provided therein." (Majority opinion, *ante* at p 513.)

tion as a voter.    My mother's maiden name was
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

  "Signature of elector . . . . . . . . . . . . . . . . . . . . . . . . .
  "Present residence address . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

  "After the expiration of 30 days, the clerk shall
cancel the registrations of all electors thus notified
who have not applied for continuations.  A proper
entry shall be made on the registration card of each
elector whose registration is canceled.  Any elector
whose registration has been canceled may have his
registration reinstated under the same qualifications
required at the time of the initial registration, in
which case the clerk shall note the reinstatement
date on the applicant's former registration card,
affix his signature thereto and replace both the pre-
cinct and master cards in the active files, or a new
set of cards may be executed in connection with
such reinstatement.  A reinstated registration shall
be valid for the same period as a new registration."

  Yes, this is the statute our majority straight-
facedly alleges has placed an invidious burden on
the § 1 (of article 2) guaranteed right of a citizen,
"who meets the requirements of local residence pro-
vided by law", to vote.    Noting again that the
Brethren have chosen to make such allegation on
sole strength of § 1, it is time for a timid dissenter's
inquiry:  Just what is this Sisyphean burden, the
cross of which habitually delinquent voters must
bear (assuming they are alive to carry it and have
not moved from the addresses of canceled registra-
tion)?   Indeed, it must be that of having forced
on the two year derelict a most vexatious choice
of means to obtain or renew his registration, such as

  (a) Ambling or driving over to his new or former
precinct station to sign up, doing so 30-odd days
prior to the next election at which he wishes to

vote, thus complying with section 497 of the code (MCLA 168.497; MSA 6.1497), or

(b) By complying with quoted section 509; such compliance consisting of that irritating task of scribbling on the section 509 form (delivered to his very door at public expense and in ample time) of his mother's maiden name plus his own signature and address (no more than eight words in all), and mailing or otherwise returning the form to the clerk, or

(c) If either of the above means is too irritating or oppressive, then by calling on his clerk (and in Detroit upon his union as represented here by the arrayed plaintiffs) to continue or step up that voter-convenient program of door-to-door or other nearby registration (as at firehalls, supermarkets, factories, etc), such as Division 2 of the Court of Appeals found valid in *Edwards* v *Flint City Clerk* (9 Mich App 367).[10]

Let us examine, in full, aforesaid § 1:

"Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes."

The Brethren seem to have overlooked that people-declared qualifier, "and who meets the require-

---

[10] We denied leave to review *Edwards* April 16, 1968 (380 Mich 765), partly on strength of Judge QUINN's opinion and partly upon the reasoning of then eminent Attorney General Thomas M. Kavanagh (August 25, 1955, No 2,258), and that of equally distinguished present Attorney General Kelley.

The mentioned opinion of Attorney General Kelley was in letter form. It was addressed January 9, 1968 to Representative Albert R. Horrigan. It referred to such door-to-door practice as "armchair registration" and was submitted to us by Attorney General Kelley, along with Attorney General Kavanagh's said opinion, in support of denial of the *Edwards* application for leave.

ments of local residence provided by law", for there is no reference thereto in the majority opinion and no attempt therein to explain why quoted § 5 of the same article should not be unitarily applied with quoted § 1. So I pose a fair question, keeping in mind the determination of the Court to decide this case on non-Federal ground as the Justices summon withal the proclaimed support of a plethora of USSC decisions dealing with that concededly worthy but instantly irrelevant requisite of "a compelling State interest".[11]

Why may not the legislature of our State enact, validly "by law" pursuant to *§ 1 of article 2,* any easy-to-perform requirement of biennial proof "of local residence" such as section 509 imposes when the registrant hasn't voted at any general or special election over a period of two years? The majority answer to this is so patently and boldly partisan as to justify quoting the lay view of the Court's action which the Detroit Free Press provided editorially March 25:

"The real motive is transparent. More Democrats than Republicans fail to vote in non-presidential years, and therefore more Democrats than Republicans have their names stricken from the rolls. A permanent order following the temporary order, which Mr. Sachs is hoping for, means Democratic votes.

"We do not blame the political and pressure groups for filing the suit. After all, they're trying to win elections. But the Supreme Court is supposed to be safeguarding the Constitution, not rewriting it. And the Democrats, once elected, are supposed to forget that they are Democrats so that they can interpret the laws fairly and impartially."

---

[11] Not including recent *Dunn* v *Blumstein,* 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972); of which more later.

Reiterating that we are on non-Federal ground, we find that the Brethren scorn the mandatory middle sentence of § 4 of article 2: "The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." And the Brethren do not mention or attempt traverse of the record fact that many an urban registrant changes his residence so regularly as to verify the consummate wisdom of section 509's compliance with the quoted mandate of § 4.

Refer now to the joint appendix. That appendix could be replete with much more of the same evidence it supplies. Yet the supplied evidence proves beyond all but a sophister's doubt what is known generally in our larger cities; that the population thereof is more transitory, residencewise, than is true of those residing in outlying cities, villages and areas of enduring home life distinguished from tenant occupancy. It discloses without denial as regards Lansing, for the years 1963–1969, that out of 39,290 section 509 notices mailed, 9,842 were returned with stamp "P.O. Unable to Deliver"; that 894 had moved, and 1,897 had changed addresses. It shows also as to Flint that in December of 1968 the clerk forwarded section 509 notices to 7,131 registered electors and that 3,500 of those forwarded were "returned by the post office as undeliverable".

For some curious reason however, the appendix fails to show like "Unable to Deliver" evidence of changes of residence in Detroit; Michigan's largest city and real Democratic stronghold.[12] It shows only that in that city, for the decade 1960–70, the clerk

---

[12] The Attorney General tells us that such corresponding number of "non-deliverable" section 509 notices "are not available". Why are the Detroit figures not "available"?

issued section 509 notices with their included forms of "application for continuation of registration" to a total of 885,386 registrants; that 245,992 of such registrants renewed their registration and that 639,394 other registrants were purged for want of filling out of the form and mailing it in.

I dwell upon these Lansing and Flint figures for what the disdaining majority must realize are significant reasons. One is that section 509 is a patently effective reinforcement of § 1's directive that a voter should meet "the requirements of local residence provided by law". The next is that section 509 provides convincing evidence of a valid legislative effort to comply with § 4's mandate to provide a "system of voter registration and absentee voting". The last and most important is that section 509 is bound if administered per § 4's intent—of the people that is—to deter "abuses of the elective franchise".

It would be difficult to obtain better evidence that a registered voter has changed his residence, from that set forth in his registration, than inability of the postman to deliver his section 509 notice. Hence, utilizing the Lansing and Flint percentages of nondeliverable notices as a standard for application to the even more mobile registrants of Detroit, one may easily understand that the disrobed purpose of this action is to obtain for these plaintiffs judicial relief from more and more organizational work, and more and more door-to-door leg work, as they mobilize the Detroit Democratic vote for this big year of the Presidential election. Sure, these indifferent registrants in the larger cities must be re-registered first, and then gotten out to vote. Behold the Court's quick response by peremptory order to that Macedonian cry of old.

Desiring no role similar to that undertaken by Don Quixote, I find no useful prospect in any or further tilt with this madly running windmill of Democratic politics. I prefer instead to take issue with the Court's not so forthright determination *to reach decision exclusively on state ground;* a cute way to exempt such a statewide important decision from Federal review.

In this setting let us examine *McDonald* v *Board of Election Commissioners,* 394 US 802; 89 S Ct 1404; 22 L Ed 2d 739 (1969). There we find the gospel according to Mr. Chief Justice Warren on behalf of a unanimous Court; gospel which the Brethren hurry away from by that curiously inexplicable footnote (*ante* at p 516); "This case is clearly distinguishable on its facts."

*McDonald* surely *is* "distinguishable on its facts," but not upon facts of aid to the plaintiff political organizations and leaders. The predicament of Mr. McDonald as a qualified voter, compared with the alleged justiciable dilemma of these plaintiffs or of any registrant crossed-off under section 509, leaves no contest. Mr. McDonald's plight was real and at least justiciable to and before this country's highest Court. Here the averred difficulty of the plaintiffs and of any section 509-canceled registrant is nonactionable for want of any showing (as in *McDonald* at 808) "that Illinois [in this case Michigan] has in fact *precluded* appellants from voting." Will not our majority please tell the national profession, interested these days as it specially has to be in voting rights, just how Michigan by section 509 "has in fact precluded," from voting, any former registrant who yet may bestir himself for reregistration between the date of the Court's instant decision and that "fifth Friday" next July?

Mr. McDonald, a duly qualified voter of Cook County as said, was unable to vote because he was imprisoned in that county and, by the law of Illinois (because Illinois had failed to provide therefor), could not obtain an absentee ballot. He sought equal protection relief, with result now to be disclosed. Here the plaintiffs are political organizations and political leaders seeking injunctive relief for *themselves*. There is no pretense that any citizen of Michigan, being eligible by Constitution and statute, may not for Michigan's upcoming primary and general elections register or reregister himself during the next few months, by any choice of the ways that are provided by chapter 23 of our election code (headed "Registration of Electors") (MCLA 168.491 *et seq.*; MSA 6.1491). Now for *McDonald.*

There the question brought to review was stated by Chief Justice Warren (p 803):

"The constitutionality of Illinois' failure to include them with those who are entitled to vote absentee is the primary issue in this direct appeal from a three-judge court."

In lieu of a dissenters' presentation let *McDonald* speak of when and when not the "compelling State interest" rule applies (pp 806–808):

"Before confronting appellants' challenge to Illinois' absentee provisions, we must determine initially how stringent a standard to use in evaluating the classifications made thereunder and whether the distinctions must be justified by a compelling state interest; for appellants assert that we are dealing generally with an alleged infringement of a basic, fundamental right. [Citing authorities.] Thus, while the 'States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised,' *Lassiter* v

*Northampton County Board of Elections,* 360 US
45, 50 [3 L Ed 2d 1072, 1076; 79 S Ct 985] (1959),
we have held that once the States grant the fran-
chise, they must not do so in a discriminatory man-
ner. [Citing authority.] More importantly, how-
ever, we have held that because of the overriding
importance of voting rights, classifications 'which
might invade or restrain them must be closely scru-
tinized and carefully confined' where those rights
are asserted under the Equal Protection Clause;
*Harper* v *Virginia Board of Elections, supra,* [383
US 663; 86 S Ct 1079; 16 L Ed 169 (1966)] at 670
[16 L Ed 2d at 174]. And a careful examination
on our part is especially warranted where lines are
drawn on the basis of wealth or race, *Harper* v
*Virginia Board of Elections, supra,* two factors
which would independently render a classification
highly suspect and thereby demand a more exacting
judicial scrutiny. [Citing authorities.]

"Such an exacting approach is not necessary here,
however, for two readily apparent reasons. First,
the distinctions made by Illinois' absentee provi-
sions are not drawn on the basis of wealth or race.
Secondly, there is nothing in the record to indicate
that the Illinois statutory scheme has an impact on
appellants' ability to exercise the fundamental right
to vote. It is thus not the right to vote that is at
stake here but a claimed right to receive absentee
ballots.[13] Despite appellants' claim to the contrary,
the absentee statutes, which are designed to make
voting more available to some groups who cannot
easily get to the polls, do not themselves deny appel-
lants the exercise of the franchise; nor, indeed, does
Illinois' Election Code so operate as a whole, for
the State's statutes specifically disenfranchise only
those who have been convicted and sentenced, and
not those similarly situated to appellants. Ill Rev

---

[13] The specific paraphrase for the appeal at bar is:
"It is thus not the right to vote that is at stake here but a
claimed right to have party-relief from reregistration drives every
four years."

Stat, c 46, § 3–5 (1967). Faced as we are with a constitutional question, we cannot lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded appellants from voting.     *     *     *

*"Since there is nothing to show that a judicially incapacitated, pretrial detainee is absolutely prohibited from exercising the franchise,* it seems quite reasonable for Illinois' Legislature to treat differently the physically handicapped, who must, after all, present affidavits from their physicians attesting to an absolute inability to appear personally at the polls in order to qualify for an absentee ballot. Illinois could, of course, make voting easier for all concerned by extending absentee voting privileges to those in appellants' class. Its failure to do so, however, hardly seems arbitrary, particularly in view of the many other classes of Illinois citizens not covered by the absentee provisions, for whom voting may be extremely difficult, if not practically impossible." (Emphasis by present writer.)

## SUMMARY OF ADDITIONAL NOTES MADE SINCE ORAL ARGUMENT

1. It is hardly believable that any Court, this uniquely nominated and elected Court excepted, would even consider a mandatory final decision such as these plaintiffs have demanded and promptly obtained. They, the designated plaintiffs, have failed to establish (because they simply could not) *any* legal or equitable inadequacy of the remedies provided by chapter 23 of our election code; a chapter which the Legislature enacted in strict pursuance of the mandate of § 4 of the second article.

Need the Court be reminded again that any otherwise eligible citizen, and every registrant crossed-off by section 509, may conveniently register or re-register at any time prior to that 30-odd day period that precedes August 8, 1972 (primary election day),

or if not then, at any time prior to that 30-odd day period that precedes November 7, 1972 (general election day)? Is there not here an adequate administrative remedy for the wrong claimed by the plaintiffs, the exhaustion of which they must first plead and prove? See Justice Brandeis, writing for the unanimous Court in *Myers* v *Bethlehem Shipbuilding Corp*, 303 US 41, 50–51; 58 S Ct 459; 82 L Ed 638 (1938) this solidly established rule of equity jurisdiction:

"The contention is at war with the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases where, as here, the contention is made that the administrative body lacked power over the subject matter."[14]

2. The reference above to "any otherwise eligible citizen" prompts distinctive consideration of ink-fresh *Dunn* v *Blumstein*, 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972).[15] That appeal brought up for review Tennessee's constitutional requirement of residence for one year in the State and three

---

[14] Consider the abundant authorities cited by Justice Brandeis in footnote 9, headed "The rule has been most frequently applied in equity where relief by injunction was sought."

[15] Of course, our own (§ 1 of the second article) requirement of six months residence in Michigan is not presently involved. Nor is consonant section 492 of our election code (MCLA § 168.492; MSA 6.1492). If either was involved, there would be no great problem, or need for formal amendment either of § 1 of the second article or of section 492.

The reason lies with the Supremacy Clause and the necessary application thereof per *Dunn* v *Blumstein* to § 1 and section 492; "for the Constitution, laws and treaties of the United States are as much a part of the laws of every State as its own local laws and constitution." (*Blythe* v *Hinckley*, 173 US 501, 508; 19 S Ct 497; 43 L Ed 783 [1899]; repeated in same case, 180 US 333, 338; 21 S Ct 390; 45 L Ed 557 [1901]). *Dunn* v *Blumstein* actually amends the 2 sections mentioned, and reduces Michigan's requirement of 6 months residence to 30 days.

months in the county of residence as a condition of registration for voting in Tennessee. The attack there was not, as at bar, made upon leisurely available means either to continue one's registration or to reregister. Its thrust instead was made against the too-long "durational residence" imposition of Tennessee's Constitution. The Supreme Court ruled that such an imposition denied equal protection and amounted to an *absolute denial of the right of the plaintiff Blumstein to vote in his new state of residence.*

"Blumstein moved to Tennessee on June 12, 1970, to begin employment as an assistant professor of law at Vanderbilt University in Nashville. With an eye towards voting in the upcoming August and November elections, he attempted to register to vote on July 1, 1970." The county registrar refused to register him, citing the aforesaid one year and three months limitations of the Tennessee Constitution. Then, *"After exhausting state administrative remedies,* Blumstein brought this action challenging these residence requirements on federal constitutional grounds." (Emphasis by present writer.)

The prevailing opinion of the Court concentrated its whole force upon and around this now nationally binding application of the Fourteenth Amendment (p 4275):

It is sufficient to note here that 30 days appears to be an ample period of time for the State to complete whatever administrative tasks are necessary to prevent fraud—and a year, or three months, too much."

Utilizing the express language of *McDonald* (p 808, footnote), it is distinguishably enough to say of Professor Blumstein's action that he *was* "in fact

absolutely prohibited from voting by the State";
*not* that he was literally begged by the State [Michigan here] to renew his registration by filling out eight words on a publicly provided—at his very door—form, and by mailing it back. Nor was the Professor permitted, as here with respect to every section 509-suspended registrant, to register for those upcoming primary and general elections.

Of course none of this is very difficult for the reasonably intelligent and not so biased lay mind to perceive, as witness the Detroit Free Press' lead editorial of March 25 last, commenting on *Dunn* v *Blumstein:*

"This trend toward removing artificial barriers from voting is healthy and ought to be encouraged. One distinction needs to be made, however. *This is hardly the same as relaxing state standards for removing ineligibles from the voting lists. Indeed, there is a need,* in recognition of what mobile people Americans are, *to provide for a purge of the voter list at reasonable intervals to protect against fraud."* (Emphasis supplied by present writer.)

"The U.S. Supreme Court has recognized one aspect of the problem of mobility among voters. Michigan and other states should continue to keep tight control of the other big one, which is the danger of fraud."

By a separate editorial that same day the Free Press inelegantly dubbed the thrust of the present action as:

"Baloney, and any judge of any court in the state who doesn't know it's baloney shouldn't be a sitting judge."[16]

---

[16] The dictionary tells us that baloney, spelled thus, is "pretentious nonsense: something false or insincere." Being a timid soul, I do but join the Free Press in saying that *Dunn* v *Blumstein* has no application to any case where a validly registered voter, once his name is stricken from the list under section 509, may yet

3. Referring back to my proposal that an order of self-disqualification should enter, consider again *Tumey* v *Ohio* (quoted in *In re Murchison, supra* at 136); also *Lookholder* v *State Highway Commissioner,* 354 Mich 28, 32, 33 (1958), the latter following *Tumey.* In *Tumey* the Supreme Court pointed out what is true here (just as we did on strength of *Tumey* when *Lookholder* was decided): "Then the circumstance that there is no judge not equally disqualified to act in such a case has been held to affect the question." Mr. Chief Justice Taft went on (pp 522–523):

"We are not embarrassed by such considerations here for there were available in this case other judicial officers who had no disqualification either by reason of the character of their compensation or their relation to the village government."

4. I have written that the real purpose of this action is to obtain judicial relief for the plaintiff Democratic Party. The leaders thereof straight-facedly tell us that its every four-year task of mobilizing the big city vote *is getting just too onerous.* Read the bodacious gut paragraph of the instant complaint. It comes here with no blush of bashfulness:

"12. While the registration rolls for succeeding elections have not yet closed, plaintiffs and members of their class are without adequate remedy, save as herein prayed, in that:

---

with easygoing convenience reregister up to that 30-odd day period prior to voting. I may though, add the following with grace and good manners:

The Free Press can hardly be regarded as pro-Republican. When *its* editorial staff cannot stomach the sordid nature of this partisan lawsuit with its hurriedly ordered (March 10) grant of full relief to the plaintiff Democrats, the reader or readers of these presents will comprehend the sickening nausea this more delicately ordered member of the Court has suffered during and since argument of the instant appeal.

"(1) Individual plaintiffs have suffered irreparable injury (except as hereafter judicially remedied), and a requirement that individual plaintiffs re-register would itself be a constitutionally impermissible burden to the exercise of the franchise which such plaintiffs theretofore enjoyed and which they would have continued to enjoy but for the unlawful implementation of Section 509;

"(2) Plaintiffs are advised and represent, on information and belief, that hundreds of thousands of otherwise qualified electors in Michigan have had their registrations recently purged, from and after December, 1970, including more than 84,000 in the city of Detroit alone, and there is no simple, expeditious and inexpensive remedy for such members of plaintiffs' class to effect reinstatement of their registrations except vast and expensive registration drives, campaigns and efforts by persons and organizations, including plaintiff organizations, in dissipation of their resources; and

"(3) Unless directed to do otherwise by judicial order, as hereinafter prayed, defendant and local election clerks will illegally expend vast sums of public monies in salaries and otherwise for the unnecessary re-registration of qualified electors."

5. Nothing written above is to be taken as a Republican brief. Having been a Republican nominated Attorney General and a Democratic nominated Justice, the writer can of 25 years' cynical experience say that, were today's situation reversed, with the Republican party and the top chieftains thereof standing before our bench as petitioners for mandamus in aid of one of *its* artfully partisan schemes, and were the Court dominated as once it was in my time by Republican nominated Justices, no one could or would entertain honest doubt that all such nominees would be just as stubbornly party-inclined as are today's five Democratic nominees. Neither party has a first mortgage on using or at-

tempting to use the Court for partisan advantage. Thus it was from the beginning, is now and ever shall be (until Michigan electors rise up and make their Supreme Court truly nonpartisan, *just as all the rest of her courts now are*).

6. Unless today's majority, "Drest in a little brief authority,"[17] belatedly confronts and decisively decides the Federal question raised and discussed but left hanging in its opinion, the people's will conveyed to us by §§ 1 and 2 of the second article will have been thwarted by injudicious action, the apparent partisanship of which will not down. I can only conclude that the gentlemen of the majority believe honestly that they in fact were sent to the third branch to represent the Democratic Party, the same as obtained when four of them were Democratic-nominated and Democratic-elected to other high state office.

Of the four, two were Democratic Governors and two were Democratic Attorneys General. But they did not, when they were officers of the executive branch, wear robes in courtrooms. Nor were they duty bound then as they are now by Judicial Canon 14, "Independence". That Canon is the very soul of the judicial process.[18] It applies exclusively to the judicial branch, of which we all are now a part.

I vote for entry of an order pursuant to § 23 of the judicial article, reciting our voluntary disqualification and assigning the Court of Appeals, sitting *en banc,* to Supreme Court duty for the purpose of hearing and determining this appeal on directed resubmission thereof.

---

[17] From Isabella's face to face open court denunciation of the recreant judge in *Measure for Measure,* Act 2, sc 2, lines 117 *et seq.*

[18] Not by any means the kind of soul which lawyer Riley castigated in 1896 before a Houghton County jury, during the trial of *Andrews* v *Tamarack Mining Co,* 114 Mich 375, 384 (1897) ("ten million souls of men like that could get inside a mustard seed and never lack for room.").

## APPENDIX

(Supreme Court order dated March 10, released to press March 13 [Mich State UAW et al v Secretary of State], enjoining Secretary of State and reinstating "all registrations heretofore cancelled".)

The petition of plaintiffs and appellants for amendment of the injunctive order of this Court dated December 17, 1971 in this cause is considered, and the same is hereby GRANTED. It is Ordered that the injunctive order of this Court dated December 17, 1971 is amended to read as follows:

"A petition for temporary injunction to suspend enforcement of Section 509 of the Michigan Election Law pending decision by the Court herein is considered. It is Ordered that Richard H. Austin, Secretary of State, defendant-appellee, and through him as chief election officer of Michigan, election clerks generally, are enjoined during the pendency of this appeal or until the further order of the Court, from applying the provisions of said Section 509. Provided, however, that this order shall apply only to the cancellation of the registration of any elector and not prohibit either the review of the registration records and the mailing of the statutory notices as required by section 509 or the cancellation of the registration of any elector upon receipt by the clerk of reliable information that such elector has 'moved away from the municipality' as authorized by section 513."

It is further Ordered that all registrations heretofore cancelled or held in abeyance on or after December 1970 pursuant to Section 509 of the Michigan Election Law shall, for all purposes, be considered and treated as reinstated.

Black, T. E. Brennan and Swainson, JJ., dissenting.