CAVANAGH, J.
(dissenting). This case is not about preventing voter fraud, it is not about thwarting abuses of the electoral franchise, and it is certainly not about preserving the purity of elections. This case is simply about protecting the right to vote for all Michigan *47 citizens. As our Michigan Constitution provides: “All political power is inherent in the people. Government is instituted for their equal benefit, security and protection.” Const 1963, art 1, § 1. Today’s decision ignores this constitutional principle and endorses misguided legislation that significantly impairs the fundamental right of thousands of our citizens to vote. The statute at issue and the majority’s approval of this statute ignore the fact that the government does not bestow the right to vote on our citizens. The right to vote is inherent, and the government’s role is simply to protect this right. Today, our government has failed its citizens. Because I believe this ill-advised legislation is unconstitutional, I respectfully dissent.
I. THE RIGHT TO VOTE IS FUNDAMENTAL
“No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.” Wesberry v Sanders, 376 US 1, 17; 84 S Ct 526; 11 L Ed 2d 481 (1964). “The right to vote freely for the candidate of one’s choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.” Reynolds v Sims, 377 US 533, 555; 84 S Ct 1362; 12 L Ed 2d 506 (1964); see also Kramer v Union Free School Dist No 15, 395 US 621, 626; 89 S Ct 1886; 23 L Ed 2d 583 (1969). The fundamental right to vote encompasses the right to actually have those votes counted. Reynolds, supra at 554. In Michigan, our citizens’ right to vote is protected by the Michigan Constitution, as well as the Equal Protection Clause of the United States Constitution.[1]
*48 This Court has long recognized that the “right to vote has always received a preferred place in our constitutional system. The importance of this right cannot be overemphasized. It is the basic protection that we have in insuring that our government will truly be representative of all of its citizens.” Michigan State UAW Community Action Program Council v Secretary of State, 387 Mich 506, 514; 198 NW2d 385 (1972). “[T]he right to vote is accorded extraordinary treatment because, it is, in equal protection terms, an extraordinary right: a citizen cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process.” Plyler v Doe, 457 US 202, 233; 102 S Ct 2382; 72 L Ed 2d 786 (1982) (Marshall, J. concurring). While the state has the authority to regulate elections pursu *49 ant to Const 1963, art 2, § 4, the state cannot pass a law that violates the Equal Protection Clause. See Williams v Rhodes, 393 US 23, 29; 89 S Ct 5; 21 L Ed 2d 24 (1968).
This Court has been asked to issue an advisory-opinion pursuant to Const 1963, art 3, § 8, addressing the constitutionality of § 523 of 2005 PA 71, which requires voters to provide an official state identification card, a driver’s license, or other generally recognized picture identification card to vote. The statute also provides that a voter who does not have one of these forms of identification must sign an affidavit to that effect before being allowed to vote. The statute provides, in relevant part, the following:
(1) At each election, before being given a ballot, each registered elector offering to vote shall identify himself or herself by presenting an official state identification card issued to that individual... , an operator’s or chauffeur’s license issued to that individual... , or other generally recognized picture identification card and by executing an application showing his or her signature or mark and address of residence in the presence of an election official. If an elector’s signature contained in the qualified voter file is available in the polling place, the election official shall compare the signature upon the application with the digitized signature provided by the qualified voter file. If an elector’s signature is not contained in the qualified voter file, the election official shall process the application in the same manner as applications are processed when a voter registration list is used in the polling place. If voter registration lists are used in the precinct, the election inspector shall determine if the name on the application to vote appears on the voter registration list. If the name appears on the voter registration list, the elector shall provide further identification by giving his or her date of birth or other information stated upon the voter registration list. In precincts using voter registration lists, the date of birth may be required to be placed on the application to *50 vote. If the signature or an item of information does not correspond, the vote of the person shall be challenged, and the same procedure shall be followed as provided in this act for the challenging of an elector. If the person offering to vote has signed the registration card or application by making a mark, the person shall identify himself or herself by giving his or her date of birth, which shall be compared with the date of birth stated upon the registration card or voter registration list, or shall give other identification as may be referred to upon the registration card or voter registration list. If the elector does not have an official state identification card, operator’s or chauffeur’s license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act. However, an elector being allowed to vote without the identification required under this subsection is subject to challenge as provided in section 727. [MCL 168.523.]
A photo identification requirement was previously passed by the Legislature in 1996, but the Attorney General issued an opinion that the photo identification requirement in 1996 PA 583 violated the Equal Protection Clause of the Fourteenth Amendment. OAG, 1997-1998, No 6930, p 1 (January 29, 1997). The legislation passed in 1996 was identical in every relevant respect to the legislation at issue in this case, and the photo identification requirement has not been enforced since that time.
The Attorney General stated: “For the poor, those who do not drive, especially the elderly, the handicapped and those who, for whatever reason, do not possess a picture identification card, this requirement imposes economic and logistical burdens.” Id. at 3. The Attorney General acknowledged that the prevention of voter fraud is, of course, a valid governmental interest, but the prevention of nonexistent voter fraud did not sur *51 vive the required strict constitutional scrutiny. The Attorney General stated that “as the chief law enforcement official of the State of Michigan, I am not aware of any substantial voter fraud in Michigan’s elections. I have not received complaints regarding voter fraud.” Id. The Attorney General also relied on confirmation from the state’s chief elections official, then-Secretary of State Candice Miller, for further evidence of the fact that Michigan does not have a voter fraud problem. Id. The Attorney General concluded that because the state of Michigan does not have an issue with voter fraud, the photo identification requirement “is simply not necessary to promote a compelling governmental interest.” Id. Thus, because the photo identification requirement was not necessary to promote a compelling governmental interest and it denied the right to vote to our state’s citizens, the earlier statute that required photo identification to vote was never implemented.
II. THE PHOTO IDENTIFICATION REQUIREMENT IMPOSES A SEVERE BURDEN ON MICHIGAN’S CITIZENS
The photo identification requirement violates the Equal Protection Clause because it unduly burdens our citizens’ right to vote. As this Court has stated, any law that affects elections places a burden on the right to vote. Michigan State UAW, supra at 516. The United States Supreme Court has also held that when a statute places a condition on the exercise of the right to vote, an exacting test is required. Dunn v Blumstein, 405 US 330, 337; 92 S Ct 995; 31 L Ed 2d 274 (1972). If a challenged statute grants the right to vote to some citizens and denies the right to vote to other citizens, the court must determine whether the exclusions are necessary to promote a compelling state interest. Id. “Any burden, however small, will not be permitted unless there is demonstrated a compelling state inter *52 est.” Michigan State UAW, supra at 516, citing Lane v Wilson, 307 US 268, 275-277; 59 S Ct 872; 83 L Ed 1281 (1939). When restrictions are enacted on the basis of race or wealth, the restriction is highly suspect and demands exacting judicial scrutiny. McDonald v Bd of Election Comm’rs of Chicago, 394 US 802, 807; 89 S Ct 1404; 22 L Ed 2d 739 (1969). Notably, the Equal Protection Clause “guards against subtle restraints on the right to vote, as well as outright denial.” Wilkins v Ann Arbor City Clerk, 385 Mich 670, 684; 189 NW2d 423 (1971).
To determine whether a restriction indeed compels strict scrutiny, the extent to which a requirement burdens a citizen’s rights must be examined. Burdick v Takushi, 504 US 428, 434; 112 S Ct 2059; 119 L Ed 2d 245 (1992). When a restriction is reasonable and nondiscriminatory, the state’s important regulatory interests are generally sufficient to justify the restriction. Id. But when a restriction is severe, the regulation must be narrowly tailored to advance only a compelling governmental interest. Id.; see also Illinois Bd of Elections v Socialist Workers Party, 440 US 173, 184; 99 S Ct 983; 59 L Ed 2d 230 (1979). When a statute will deny some citizens the right to vote, the general presumption of constitutionality is not applicable. Kramer, supra at 628. “The presumption of constitutionality and the approval given ‘rational’ classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people.” Id. But “when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality.” Id.
While Kramer dealt with legislation that explicitly denied certain citizens the right to vote in school *53 district elections, this fundamental premise is equally as sound in the case before us. The challenge to the photo identification requirement is that it will disproportionately deny the right to vote to racial and ethnic populations, as well as to the elderly, the poor, and citizens who are disabled. The government — which should be the voice of fairness in providing protection to all citizens — is the very entity that has enacted the legislation that is allegedly discriminatory. The government cannot now shield itself from strict scrutiny because it provides only a purported rational basis for the requirement while simultaneously failing to provide any evidence to support its purported rationale. Our Legislature — even one that has been fairly elected— “can exclude a minority of voters from any voice in the decisions just as effectively as if the decisions were made by legislators the minority had no voice in selecting.” Id.
“[T]he State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit.” Clingman v Beaver, 544 US 581, 603; 125 S Ct 2029; 161 L Ed 2d 920 (2005) (O’Connor, J., concurring); see also Tashjian v Republican Party of Connecticut, 479 US 208, 225; 107 S Ct 544; 93 L Ed 2d 514 (1986) (The Court recognized that the interests of the state represented, to some extent, the views of the one political party enjoying majority power.). Recognizing the basic fact that the government is not always wholly independent and unbiased does not mean that reasonable and genuinely neutral and necessary requirements cannot be imposed. But it does mean that an intellectually honest examination of a requirement must begin with recognizing this basic political fact and examining what role this has played in the enactment of the requirement at issue. See, e.g., Crawford v Marion Co *54 Election Bd, 472 F3d 949, 954 (CA 7, 2007) (Crawford I) (Evans, J., dissenting). As requirements “become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition.” Clingman, supra at 603 (O’Connor, J., concurring).[2]
“[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.” Harper v Virginia Bd of Elections, 383 US 663, 670; 86 S Ct 1079; 16 L Ed 2d 169 (1966). Thus, to determine if a law violates the Equal Protection Clause, the court must weigh the character and magnitude of the burden caused against the interests that justify the burden. See Timmons v Twin Cities Area New Party, 520 US 351, *55 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997). Specifically, the court looks at three areas: “[T]he character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification.” Dunn, supra at 335. In examining the character of the classification, the court must consider the facts and circumstances behind the law. Williams, supra at 30. While there is no bright-line test to separate permissible election-related regulations from unconstitutional infringements on our citizens’ right to vote, the court must consider the extent to which the state’s concerns make the burden necessary. Timmons, supra at 358. But “[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgement of fundamental rights, such as the right to vote . . . .” Tashjian, supra at 217. Because voting involves the assertion of a fundamental constitutional right and this case deals with the actual right to vote, and not merely a minor regulation regarding the time, place, or manner of elections, the compelling state interest test must be applied. See Wilkins, supra at 681. Thus, if the state is unable to demonstrate a compelling interest for the significant impairment it seeks to implement, then the statute must be deemed unconstitutional. Id. at 682.
The majority purports that “the state is not required to provide any proof, much less ‘significant proof,’ of in-person voter fraud before it may permissibly take steps to prevent it.” Ante at 27. But the majority ignores a critical aspect of the caselaw it cites. A state can respond to a potential deficiency only if “the response is reasonable and does not significantly impinge on constitutionally protected rights.” Munro v Socialist Workers Party, 479 US 189, 196; 107 S Ct 533; 93 L Ed 2d 499 (1986). In Dunn, supra at 346, the United States *56 Supreme Court specifically noted that the record was “totally devoid of any evidence” to support a durational residency requirement. The restriction, in this case a photo identification requirement, must be reasonable given the interest the restriction allegedly serves. See Burdick, supra at 434; Timmons, supra at 358-359. Deciding if a restriction is constitutional depends very much on “the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.” Williams, supra at 30; see also Storer v Brown, 415 US 724, 731; 94 S Ct 1274; 39 L Ed 2d 714 (1974). Thus, I disagree with the majority that the state is not obligated to provide any evidence to support its asserted interest.
I also disagree with the majority’s characterization of the asserted interest. The majority alleges that the interest to be served is preventing voter fraud, but I disagree that the interest in this case can be presented so broadly. “States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials.” Timmons, supra at 364. But that does not mean that by merely making the broad claim of addressing voter fraud, a state has no limits on its actions. See Dunn, supra at 345-346. It is the circumstances of the case that determine the weight that must be afforded a stated interest. California Democratic Party v Jones, 530 US 567, 584; 120 S Ct 2402; 147 L Ed 2d 502 (2000). A court must determine the legitimacy and strength of the “precise interest” asserted by the state as its justification for the enacted restriction. Anderson v Celebrezze, 460 US 780, 789; 103 S Ct 1564; 75 L Ed 2d 547 (1983). And the restriction must precisely and specifically address the state’s interest. Kusper v Pontikes, 414 US 51, 59; 94 S Ct 303; 38 L Ed 2d 260 (1973). *57 “If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.” Id.
Of course preventing voter fraud is an important interest in the abstract, but the relevant inquiry is whether, and to what degree, in-person voter fraud would be addressed by the photo identification requirement. See California Democratic Party, supra at 584; see also American Civil Liberties Union of New Mexico v Santillanes, 2007 US Dist LEXIS 17087 *98-*99 (D NM, February 12, 2007). Using a broad interest such as preventing voter fraud would allow almost any restriction to be deemed constitutional, and this would effectively nullify any true test for constitutionality, thus allowing the government to enact almost any constraint on voting that it chooses, all in the name of preventing “voter fraud.” See Commission on Federal Election Reform, Building Confidence in US. Elections (September 2005) (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre) (“The, mere fear of voter fraud should never be used to justify denying eligible citizens their fundamental right to vote.”).[3] But the interest in this case cannot be so simplistically deemed. The interest in this case is more accurately presented as preventing in-person voter fraud when there is no evidence that in-person voter fraud actually exists.
Not only is there no evidence or history of any problem with in-person voter fraud in Michigan, but Kelly Chesney, a spokesperson for Secretary of State Terri Lynn Land, has stated: “ ‘We have a number of checks and balances inherent in the process to prevent “fake people” from voting .... We do believe the safe *58 guards in place will protect the integrity of the election.’ ” Chad Selweski, Flood of voter registrations raises specter of election fraud, Macomb Daily, September 30,2004[4]; see also Bay Co Democratic Party v Land, 347 F Supp 2d 404, 437 (ED Mich, 2004). Former Attorney General Frank J. Kelley has also stated that Director of Michigan Elections Christopher Thomas recently informed him “that he had never observed or heard of a single case of a voter using fake identification at the time of voting.” Amicus brief at 3. The reality is that the issue of access to the voting polls can unfortunately be turned into a political issue. As reported earlier this year, a federal panel — the Election Assistance Commission— downplayed the findings of experts who conducted election research and found there was little voter fraud around the nation. Ian Urbina, U.S. Panel is Said to Alter Finding on Voter Fraud, N.Y. Times, April 11, 2007.[5] Instead, the panel “issued a report that said the pervasiveness of fraud was open to debate.” Id. The panel also changed the original report’s findings that evidence of continued outright intimidation and suppression existed and that registration forms had not been used in polling place fraud. Id. Just weeks earlier, the panel had also refused to release another report that it had commissioned that found that voter identification laws reduce turnout, particularly among minority group members. Id. Thus, I believe it is clear that the prevalence — or lack thereof — of voter fraud is critical to whether photo identification laws are necessary.
Moreover, when viewed objectively, the claim of “voter fraud” has repeatedly been exposed as a tactic *59 used to suppress the votes of minorities and the poor. See Editorial, Phony Fraud Charges, N.Y. Times, March 16, 2007.[6] In partisan political circles, “the pursuit of voter fraud is code for suppressing the votes of minorities and poor people.” Id. Congress is also investigating allegations that over a dozen officials in the Department of Justice used their positions for partisan purposes by enacting policies and actively supporting legislation that would impose a photo identification requirement for the purpose of suppressing the votes of minority voters. See Greg Gordon, Congress eyes alleged suppression of minority votes, Lansing State Journal, May 21, 2007, p 3A. There is mounting evidence that Justice Department officials used their positions to clear “the way for laws designed to disenfranchise minority voters . . . .” Editorial, Why This Scandal Matters, N.Y. Times, May 21, 2007.[7]
But as The New York Times reported, “There is no evidence of rampant voter fraud in this country.” Id. Instead, these allegations have been used as an excuse to pass legislation that will suppress the votes of the poor, the elderly, and minorities. Id. “The claims of vote fraud used to promote these measures usually fall apart on close inspection.” Id. For example, allegations that African-American voters in St. Louis listed addresses that were vacant lots have been determined to be unfounded. Id. When a local newspaper looked into these allegations, “it found that thousands of people lived in buildings on lots that the city had erroneously classified as vacant.” Id. (emphasis added).
*60 The majority seeks to buttress its position by arguing that the requirement is constitutional because there is evidence that 46 “dead” people voted in the November 2004 election. See ante at 42 n 110. This makes a snappy sound bite, but a more thoughtful examination of this allegation results in the finding that administrative problems and clerical errors are likely at the root of these “dead” people voting. For example, one newspaper article stated that it appeared that approximately 40 people who are dead cast votes in the primary election in August 2006 out of 134,629 votes cast in Detroit. Many Names on City’s Voter Lists may not Belong, Detroit Free Press, November 3, 2006, IB. But of these 40 people, 25 died within six weeks before the election, so those votes may have been validly cast by absentee ballot before the citizen died.
But, even more importantly, another article indicated that the city of Detroit’s election records are “plagued with mistakes and inconsistencies.” In Mich., Even Dead Vote, Detroit News, February 26, 2006.[8] Many voting “errors” were the result of clerical errors— incorrect birthdates and addresses being recorded, as well as election workers recording votes under a similar name or confusing voters with a relative. Id. The article further stated that there was no evidence of voter fraud, although allegations of fraud had been made, particularly related to absentee ballots. Id. And in articles cited by the Attorney General who filed a brief in support of the requirement, the problem with voting errors is again identified as being because of administrative problems with the voter rolls. See, e.g., Kathleen Gray, John Bebow, and Ben Schmitt, Detroit’s Flawed Registry: *61 Many Erroneous Names Found on City’s Voter Rolls, Detroit Free Press, November 3, 2005; In Mich., Even Dead Vote, supra.[9] An analysis of voting by The Detroit News found, “Clerical errors so pervasive that it is difficult to determine in many instances who actually voted. Incorrect addresses, wrong birthdates and expired residencies; typographical errors in names and addresses; and garbled spellings are regularly recorded and kept on the city’s active voter list.” In Mich., Even Dead Vote, supra. “Among the most common mistakes occur when election workers record a vote under a similar name, or confuse voters with their parents or other relatives.” Id.-, see also Spencer Overton, Article: Voter identification, 105 Mich L R 631, 645-647 (2007). Current statutory provisions already deal with these administrative issues, including MCL 168.510, which requires that the county clerk forward monthly a list of those who have died to the clerk of each city or township within the county. “The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors.” Id. If the concern truly is about “dead” people voting, the simple solution is an administrative one — do what the law requires and properly purge the voting rolls.
The photo identification requirement at issue is not narrowly tailored to meet a compelling state interest because there is no evidence of in-person voter fraud. Thus, there is no evidence of any documented need to impose a photo identification requirement. But an examination of whether the photo identification requirement violates the Equal Protection Clause does not just stop with identifying the state’s interest — in *62 this case, nonexistent in-person voter fraud. The Court must also consider the character and magnitude of the burden, as well as the interests affected by the burden. Dunn, supra at 335. This Court has declared: “It can be stated without exaggeration that the right to vote is one of the most precious, if not the most precious, of all our constitutional rights.” Wilkins, supra at 680. “The right to vote has been considered to be the most vital of our constitutional rights.” Id. at 694. Voting is a fundamental right because it is preservative of all other rights. Yick Wo v Hopkins, 118 US 356, 370; 6 S Ct 1064; 30 L Ed 220 (1886). And this basic fundamental right cannot be infringed merely because the government seeks to assert its power over supervising elections. Kusper, supra at, 414 US at 57.
In this case, the requirement deals with actual access to the ballot box. In cases dealing with direct ballot access, such as cases that deal with a residency requirement or a property ownership requirement, the most exacting level of scrutiny is required. Dunn, supra at 335; Kramer, supra at 626-627. Likewise, the requirement at issue in this case goes to the very heart of a citizen’s ability to vote at all. As the United States Supreme Court has recognized, not all cases dealing with election regulations are reviewed the same and cases that deal with actual voting rights are quite different than those that deal with other regulations. See California Democratic Party, supra at 573. Because the photo identification requirement will significantly affect the voting rights of thousands of Michigan citizens and have discriminatory effects, “applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State’s asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.” Clingman, supra at 603 (O’Connor, J., concurring).
*63 Contrary to the majority’s assertion that the photo identification requirement “applies evenhandedly to every registered voter,” ante at 25, this legislation does not affect all Michigan citizens equally, and it is disingenuous — at best — to claim that it does. As the United States Supreme Court stated in Anderson, supra at 786 (citation omitted), it is important to examine a restriction “ ‘in a realistic light’ ” to determine the extent and nature of the restriction’s impact on voters. In Bullock v Carter, 405 US 134, 144; 92 S Ct 849; 31 L Ed 2d 92 (1972), the United States Supreme Court determined that a filing fee requirement for primary elections was unconstitutional because of “the obvious likelihood that [the] limitation would fall more heavily on the less affluent segment of the community.. ..” The Court stated that “we would ignore reality were we not to recognize that this system falls with unequal weight on voters, as well as candidates, according to their economic status.” Id. The “practical difficulties” of a restriction on those who will be affected must be considered in any constitutional analysis. See, e.g, Lane, supra at 277.
Examining the photo identification requirement “in a realistic light” clearly indicates that distinct populations in Michigan will be uniquely and substantially burdened by the photo identification requirement. The reality is that not all our citizens live a life in which they have photo identification, and obtaining photo identification solely to vote causes a severe burden. To many, it may seem unimaginable to live a life in which a person has no photo identification, but to thousands of Michigan citizens, it is indeed a reality.
Proponents of the photo identification requirement argue that photo identification is a standard practice in today’s world and that photo identification is needed to *64 board an airplane, rent a hotel room, or open an account at a bank. But these arguments ignore that there are segments of our population that do not have the means to board an airplane or rent a hotel room. There are numerous Michigan citizens who do not live a life in which photo identification is a necessity, yet this does not mean that they should be subjected to obstacles when exercising their fundamental right to vote. See, e.g., Crawford I, supra at 955-956. The failure to recognize that many Michigan citizens live a life in which photo identification is not needed is the reason that proponents fail to recognize that the photo identification requirement will create a substantial obstacle to voting for thousands of Michigan citizens. This classification does not truly apply “evenhandedly” to every citizen because those without photo identification will more likely be the poor and the disenfranchised.
The photo identification requirement will have a disparate impact on racial and ethnic populations, as well as poor voters, elderly voters, and disabled voters; thus, the photo identification requirement does not affect all citizens equally. Just as the registration scheme in Lane, supra at 271, inherently operated discriminatorily, the statute at issue will diminish the opportunity for thousands of citizens to participate in the political process. The fact that the photo identification requirement contains no overt statement of discrimination does mean that the requirement will not succeed in disproportionately keeping away members of Michigan’s most disenfranchised groups. See, e.g., Carrington v Rash, 380 US 89, 92-93; 85 S Ct 775; 13 L Ed 2d 675 (1965). The discrimination that exists in the photo identification requirement is dangerous because of its fagade as a “reasonable” requirement to combat voter fraud, but the “Equal Protection Clause likewise guards against subtle restraints on the right to *65 vote, as well as outright denial.” Wilkins, supra at 684. Our citizens’ fundamental right to vote cannot be denied or abridged, whether the restriction seeks to directly or indirectly infringe on this right. Harman v Forssenius, 380 US 528, 540-542; 85 S Ct 1177; 14 L Ed 2d 50 (1965).
The majority’s dismissive attempt to trivialize the effect that this legislation will have on Michigan’s citizens is unconvincing because of the majority’s choice to ignore the realities associated with the photo identification requirement. The majority belittles any argument that this legislation will negatively affect racial and ethnic populations by claiming that “[w]hen all other arguments are unavailing, resorting to a claim of racial discrimination is a frequent substitute.” Ante at 45. Notably, the majority ignores that the poor, the elderly, and disabled voters will also be negatively affected by this legislation. Members of Congress, as well as numerous nonprofit organizations, have expressed the same concerns expressed in this dissent. See 148 Cong Rec S10488 (2002). Even the Commission on Federal Election Reform recognizes that concerns about the photo identification requirement, including that the requirement could disenfranchise voters and have an adverse effect on minorities, are “serious and legitimate.” Building Confidence in U.S. Elections, supra. And it is certainly relevant to consider the effect that photo identification requirements have had in states that have enacted identification requirements. See, e.g., Crawford v Marion Co Election Bd, 2007 US App LEXIS 7804 at *7 (CA 7, 2007) (Wood, J., dissenting) (“The New York Times recently reported that overall voter turnout in these states decreases by about three percent, and by two to three times that much for minorities.”) (citing Christopher Drew, Low Voter Turnout is Seen in States That Require ID, NY Times, February 21, 2007).
*66 Yet the majority chooses to ignore this information simply because it could then not flippantly respond that the dissent is raising a hollow claim of racism. But no matter how much the majority engages in figurative eye-rolling, the majority cannot revise histoiy and it cannot change the realities of the society in which we five. Unfortunately, the historical and current reality is that racism exists and voting regulations have been used for discriminatory reasons. The Voting Rights Act of 1965 and the Voting Rights Act amendments of 1982 were enacted to protect against racial discrimination in voting. See 42 USC 1971 and 42 USC 1973 et seq. The United States Supreme Court has recognized that certain groups of people have historically been relegated to a position of political powerlessness. Plyler, supra at 218; South Carolina v Katzenbach, 383 US 301, 308-313; 86 S Ct 803; 15 L Ed 2d 769 (1966). “The experience of our Nation has shown that prejudice may manifest itself in the treatment of some groups.” Id.; see also Bone Shirt v Hazeltine, 336 F Supp 2d 976, 1018-1023, 1026-1027, 1028-1034 (D SD, 2004) (“[Tjhere is substantial evidence that South Dakota officially excluded Indians from voting and holding office.”); Bone Shirt v Hazeltine, 200 F Supp 2d 1150, 1152 (D SD, 2002). The majority’s steadfast refusal to recognize this fact and consider even the possibility that it may affect the real-world implications of the photo identification requirement results in a condescending response to the concerns raised by numerous amici that the constitutional rights of hundreds of thousands of Michigan citizens may be negatively affected by this legislation.
The photo identification requirement may not be as obviously discriminatory as a poll tax, but its effect will be the same.[10] The photo identification requirement is merely a more sophisticated device that will disenfran *67 chise our citizens by denying and abridging their fundamental right to vote, and a restriction that places even a minimal price on a citizen’s exercising his right to vote constitutes invidious discrimination. See Bullock, supra at 142; see, e.g., Building Confidence in U.S. Elections, supra (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre) (The photo identification requirement suggested by the Commission on Federal Election Reform is “nothing short of a modern day poll tax.”). “[A] state violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard.” Harper, supra at 666. A proper examination of the photo identification requirement demands that this Court look at the true and cumulative effect of the statute’s requirement and the state’s overall regulations governing photo identification. See, e.g., Clingman, supra at 599 (O’Connor, J., concurring). This Court must not simply accept the cursory allegation that the photo identification requirement affects everyone equally. It does not. According to the Secretary of State, approximately 370,000 registered Michigan voters do not have photo identification. Dawson Bell, Court Jumps into Dispute over Voter ID Checks, Detroit Free Press, April 27, 2006.[11] While some argue that this number is actually much higher, the fact that hundreds of thousands of Michigan citizens will be affected by *68 this legislation indicates that the requirement is a serious impediment on the fundamental right to vote for these citizens. See, e.g., Michigan State UAW, supra at 516-517.[12]
As numerous amici curiae have attested, the impact that this law will have on numerous citizens will be substantial. Governor Jennifer M. Granholm; Frank J. Kelley, Attorney General Emeritus; the city of Detroit; the National Association for the Advancement of Colored People (NAACP)-Detroit Branch; the Michigan State Conference NAACP; the National Bar Association; the American Civil Liberties Union of Michigan; the League of Women Voters Detroit; the American-Arab Anti-Discrimination Committee; Project Vote; the Association of Communities for Reform Now; the Latin Americans for Social and Economic Development, Inc.; the Detroit Urban League; the National Conference Community and Justice-Michigan; the Michigan Civil *69 Rights Commission; the Michigan Department of Civil Rights; Michigan Protection & Advocacy Service, Inc.; the Michigan Democratic Party; the Michigan House Democratic Caucus; the Michigan Senate Democratic Caucus; the Michigan Legislative Black Caucus; the Lawyers’ Committee for Civil Rights Under Law; and the American Association of Retired Persons (AARP) all provided compelling arguments and information about how the photo identification requirement will truly affect our citizens, and this information should not be ignored. Notably, the amici brief submitted by Michigan county clerks, who are responsible for election administration throughout the state, recognizes, “Voters who do not have these common forms of photo identification [a driver’s license, state photo identification card, or possibly a passport] are most likely to be those who do not drive and these, in turn, are most likely to be older, and/or lower income voters, or immigrants.” Amici brief at 7. Even the United States Court of Appeals for the Seventh Circuit has recognized that “[n]o doubt most people who don’t have photo ID are low on the economic ladder . .. .” Crawford I, supra at 951.[13]
The photo identification requirement will present a monetary and logistical burden for thousands of our citizens. There is a cost associated with obtaining a driver’s license or state identification card. While the state identification card fee can be waived for some people, there are many people who will be required to *70 pay the fee. But this is not the only cost associated with the photo identification requirement. See, e.g., Weinschenk v State, 203 SW3d 201, 213-214 (Mo, 2006) (After examining the costs associated with obtaining photo identification required for voting, the Missouri Supreme Court stated that “all fees that impose financial burdens on eligible citizens’ right to vote, not merely poll taxes, are impermissible under federal law.”). Procuring the documents required to obtain a driver’s license or other acceptable state-issued identification also costs money. Multiple documents must be obtained, at a monetary cost, as well as a logistical cost, to then acquire acceptable photo identification. For example, to use a birth certificate as one of the three documents necessary to obtain a state identification card, only a certified birth certificate with a raised seal or a true copy of the birth certificate are acceptable; hospital birth certificates are not acceptable.[14] This, of course, costs even more money than just that required outright for a driver’s license or state identification card. But an interesting and important fact to note is that photo identification is required to request a copy of one’s birth certificate. So a person who needs a birth certificate to obtain photo identification must present photo identification to receive the birth certificate. Further, any documents issued by another country that are not written in English must be translated before they can be used. Translations are only acceptable from a limited number of organizations, such as a college, *71 government agency, or translation-related business, and the translation must provide detailed information about the translator. Not only must a person spend money to get the necessary documents to then travel to a Secretary of State office to get the necessary photo identification, but a person must navigate the government system and spend time doing so.[15]
The Michigan county clerks — again the very government officials who administer elections — recognize, “It is clear from examining these requirements for obtaining a personal identification card that it will be a very time consuming matter.” Amici brief at 8-9. As the Michigan county clerks further note, “It must be recognized that the very fact that these voters do not drive may make it more difficult for them to travel to the locations where the identification cards are obtained.” Id. at 7. And to obtain a driver’s license or state photo identification card a person must travel to an office of the Secretary of State. See, e.g., MCL 28.291. For many citizens, taking the time to do so, which may also mean taking time off work without pay, will create a substantial burden to exercising the citizens’ right to vote.
What appears lost on the proponents of the photo identification requirement is that encouraging citizens to vote is an essential state objective, and our government should be trying to promote voting, not passing *72 legislation that will actually discourage participation by throwing up unnecessary roadblocks. “[T]he constitutional order must be preserved by a strong, participatory democratic process.” California Democratic Party, supra at 587 (Kennedy, J., concurring); see also Building Confidence in U.S. Elections, supra (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre) (“Election reform must be about empowerment, not disenfranchisement. Raising needless impediments to voting or creating artificial requirements to have one’s vote counted are steps backward.”). But the photo identification requirement is yet another obstacle that a citizen must overcome as he proceeds along the path to exercise his fundamental right to vote. Now that citizen is less likely to exercise his fundamental right to vote because of the photo identification requirement. And the affidavit exception — if a citizen even knows of its existence — is not helpful because of the harassment and intimidation that a voter may face through the challenge process.
Merely being allowed into a polling place does not mean that a citizen’s right to vote has been protected. See, e.g., United States v Saylor, 322 US 385, 387-388; 64 S Ct 1101; 88 L Ed 1341 (1944). A citizen’s right to vote must also be protected throughout the challenge process. The burden of the photo identification requirement must be realistically viewed in light of what this means to the citizen who does not have photo identification but still wants to vote. The burden for a citizen without photo identification is not “simply” a matter of signing an affidavit and then voting. Contrary to the majority’s belief, the Michigan county clerks, who will actually administer the election, admit, “It is not yet clear whether an affidavit is a sufficient means for a voter without photo identification to attest that he is who he purports to be but lacks the requisite identifi *73 cation.” Amici brief at 10. While the majority presents the affidavit process as an insignificant inconvenience, it is actually much more burdensome to the actual voters.
The lack of photo identification makes it much more likely that a voter will be challenged because the statute explicitly references the challenge process in relation to those signing the affidavit. MCL 168.523. During the challenge process, there is the distinct possibility that a citizen may be denied the right to vote if an election inspector believes that the citizen’s answers indicate that he is not a qualified elector or if the citizen chooses not to sign the affidavit. For some citizens with disabilities, the affidavit may be too difficult to sign or understand. Howéver, unfortunately, another likely scenario is that the challenge process will be used in some situations to harass and intimidate citizens who seek to exercise their right to vote. The statute explicitly invites a challenge to a citizen who is voting without photo identification by stating that a citizen “being allowed to vote without the identification required under this subsection is subject to challenge ....” Id. The challenge process subjects those who are voting without photo identification to delay, intimidation, and harassment to a greater degree than those who have photo identification.[16] Notably, a citizen being challenged must “stand to one side until after unchallenged *74 voters have had an opportunity to vote, when his case shall [then] he taken up and disposed of.” MCL 168.728. Waiting for long periods at the polls is not uncommon, and now voters who are challenged because they do not have photo identification must wait indefinitely longer to resolve the challenge. This practical, real-world effect can be used to substantially penalize and harass those without photo identification.[17]
But a penalty cannot be imposed on a citizen who chooses to exercise his right to vote merely because he does not have photo identification. See Dunn, supra at 341, citing Harman, supra at 540. “To the extent that a citizen’s right to vote is debased, he is that much less a citizen.” Reynolds, supra at 567. As this Court has recognized, the fundamental right to vote cannot be left to the whim or impulse of an election official. Wilkins, supra at 677. It certainly is beyond dispute that certain voters in our country — and even our state — have been intimidated and harassed to keep those citizens from voting. See, e.g., Note: Eradicating racial discrimination in voter registration: Rights and remedies under the voting rights act amendments of 1982, 52 Fordham L R 93 (1983). The Commission on Federal Election Reform reports that during the 2004 elections, there were “improper requests for voter ID” and there were reports “of voter intimidation and suppression tactics.” See Building Confidence in U.S. Elections, supra. Of 55,000 calls made to a MYVOTE1 hotline on election day in 2004, 4.9 percent of the calls were about coercion and intimidation and 43.9 percent of the calls were about registration issues and poll access. Notably, elec *75 tion challengers in Michigan can be appointed by political parties, which may provide an added incentive for challenges to be made. If a challenge is successful and a citizen is deemed unqualified, there is no appeal from this decision, so a citizen’s denial of his fundamental right is absolute. See MCL 168.729. The photo identification requirement and the challenge process now again leave those who do not have photo identification at the whim of election officials as our challenged citizens are required to wait an indefinite length of time merely to exercise their fundamental right to vote.
Notably, there are already numerous statutes that criminalize voter fraud. To name just a few, it is a felony to falsely impersonate another person to vote or attempt to vote, and it is also a felony to try to induce a person to impersonate another person to vote or attempt to vote. MCL 168.932a(a). It is a felony to assume a false or fictitious name to vote. MCL 168.932a(b). It is a misdemeanor for an elector to make a material statement that is false in answering a question asked by a clerk or assistant clerk or in a registration affidavit. MCL 168.499(1). And it is perjury to give an untrue answer concerning a material matter when challenged. MCL 168.729.
Given these statutes that criminalize voter fraud, as well as the state’s comprehensive statutory scheme that manages all aspects of voting, the state’s actions in mandating photo identification are certainly not narrowly tailored or éven reasonable. See Dunn, supra at 345-346; Bay Co Democratic Party, supra at 437. Any concerns about preventing voter fraud must examine the current system to determine its completeness. Wilkins, supra at 687. In Dunn, a durational residency requirement, even assuming it had once been necessary, was no longer required because of the state’s compre *76 hensive statutory scheme. Similarly, Michigan’s statutory scheme is comprehensive when dealing with voter regulations. For example, when a citizen appears at the polls to vote, the citizen must complete an application that includes his signature and address. MCL 168.523(1). If voter registration lists are used, then the citizen must provide his date of birth or other information that appears on the voter registration list. Id. Also, if the qualified voter file is available at the polling place, the election official must compare the signature on the voter’s application that was completed at the polling place with the signature in the qualified voter file. Id.
There are also numerous laws that address the qualifications of voters, MCL 168.492; the contents of registration affidavits, MCL 168.495; ascertaining whether a voter is already registered, MCL 168.505; changes of a voter’s residence, MCL 168.506, MCL 168.507, MCL 168.507a, and MCL 168.507b; verifying the correctness of registration records by conducting a house-to-house canvas, MCL 168.515; and even registering voters confined in jail, MCL 168.492a, to name just a few. Thus, there are “a variety of criminal laws that are more than adequate to detect and deter whatever fraud may be feared.” Dunn, supra at 353. When there is such a comprehensive statutory design to prevent, address, and punish in-person voter fraud, imposing a photo identification requirement that will restrict our citizens’ fundamental right to vote is unnecessary and certainly not the least restrictive means to prevent voter fraud. See id. at 353-354.
Further, the photo identification requirement will do nothing to actually prevent in-person voter fraud, even if an incident were to occur in the future. The majority makes much of the exception to the photo identification requirement that allows a citizen to sign an affidavit *77 attesting that he is who he says he is. This affidavit allows a person to vote without showing photo identification. But if a person is willing to break the law and commit in-person voter fraud, then signing this affidavit will do nothing to deter the fraud from occurring. A person willing to risk committing a felony and being sent to prison to commit in-person voter fraud is not going to be- affected by having to sign a piece of paper. “[F]alse swearing is no obstacle to one intent on fraud . . ..” Dunn, supra at 346. As the United States Supreme Court recognized when striking down a durational residency requirement: “The nonresident intent on committing election fraud will as quickly and effectively swear that he has been a resident for the requisite period of time as he would swear that he was simply a resident.” Id. The oath swearing “becomes an effective voting obstacle only to residents who tell the truth and have no fraudulent purposes.” Id. at 346-347. Likewise, the only citizens in Michigan who will be affected will be legitimate voters who stay away from the polls because they do not know there is an exception to the photo identification requirement or those voters who fear they will suffer harassment and intimidation through the affidavit challenge process.
III. THE PHOTO IDENTIFICATION REQUIREMENT IS NOT EVEN JUSTIFIED BY A REASONABLE RATIONALE
Even if the photo identification requirement is examined under a lesser standard, the photo identification requirement is an unconstitutional burden nonetheless, because it is not a reasonable and nondiscriminatory restriction justified by an important state interest. See Burdick, supra at 434. The government’s interest in mandating the photo identification requirement must be sufficiently weighty to justify the restriction. See Timmons, supra at 365. But here the government’s *78 interest has no weight because there is absolutely no evidence that a problem with in-person voter fraud even exists.
I join my colleagues in their desire to prevent voter fraud, but I am unwilling to do so at any cost. No matter how many times the majority argues that the photo identification requirement is necessary to prevent vote dilution, it does not change the fact that there is no evidence of in-person voter fraud. Merely making the claim does not make it so. When there is no evidence of in-person voter fraud that will be corrected by the photo identification requirement and no credible evidence of this problem existing nationwide, I cannot join the majority in finding that this requirement is constitutional. See 148 Cong Rec S 10488 (October 16, 2002); see also Common Cause/League of Women Voters of Georgia, Inc v Billups, 439 F Supp 2d 1294, 1350 (ND Ga, 2006). “There is nothing in the Constitution which permits the Legislature, under the desire to purify elections, to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise.” Attorney General v Bd ofCouncilmen of the City of Detroit, 58 Mich 213, 216; 24 NW 887 (1885). “For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.” Anderson, supra at 806 (internal quotation marks and citations omitted).
It is not reasonable to impose a photo identification requirement when the alleged interest is nonexistent in-person voter fraud, especially when the requirement will significantly impinge on the rights of thousands of Michigan’s citizens. The majority cannot dismiss the argument that there is no evidence of in-person voter *79 fraud by stating that it just does not matter. It certainly matters when our citizens will have their fundamental voting rights restricted. To ascertain whether the restriction is warranted, it is indeed essential to factor into the analysis the fact that no in-person voter fraud has been shown to exist. A bald assertion is insufficient — a state’s asserted interest in a restriction must bear some sort of plausible relationship to the burden the restriction will place on its citizens. See Timmons, supra at 374-375 (Stevens, J., dissenting). And “[i]f the State has open to it a less drastic way of satisfying its legitimate interest, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.” Anderson, supra at 806 (internal quotation marks and citation omitted). The photo identification requirement that is being touted as a solution to a nonexistent problem is indeed unconstitutional because it addresses an imaginary problem while significantly undermining and burdening our citizens’ constitutional rights.
IV CONCLUSION
The constitution demands that the government vigorously protect our citizens’ fundamental right to vote. Our citizens must be able to exercise their right to vote without encumbrances that are unconstitutional and have the practical effect of limiting this right. Today’s decision is alarming because it ignores the reality of the photo identification requirement and validates the Legislature’s shortsighted attempt to restrict the rights of our citizens. It trivializes the effect that this ill-advised legislation will have on our poorest and, in many cases, most disenfranchised citizens. It appears to stem from a belief that the government gives rights to its citizens and can take these rights away on a whim and with the *80 flimsiest of excuses. But a significant impairment of our citizens’ fundamental right to vote requires justification. While this Court has abdicated its responsibility to require this justification, I believe that our citizens must demand more. Thus, I respectfully dissent.

 Our Michigan Constitution provides:
*48 Every citizen of the United States who has attained the age of 21 years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes. [Const 1963, art 2, § 1.]
Under the United States Constitution, the voting age requirement has been changed to 18 years. US Const, Am XXVI.
The Equal Protection Clause of the Michigan Constitution provides, in relevant part, the following:
No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. [Const 1963, art 1, § 2.]
The Equal Protection Clause of the United States Constitution provides:
No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. [US Const, Am Xiy § 1.]

 The majority claims that I “come perilously close to suggesting that the Legislature was motivated in enacting this statute by the desire to suppress minority voters.” Ante at 45 n 118. Yet I advocate no such position. The majority distorts my view because it believes that this will have the most shock value and because it has no response for the realistic position that I do espouse. When a political party — any political party — is in power and enacts legislation that will affect our citizens’ fundamental right to vote, it is the job of the courts to realistically examine the legislation, if it is challenged, to determine the effect it will have on our citizens. If those who are likely to be negatively affected are viewed as often not voting for the party in power, that is certainly one factor that must be considered. This is not a shocking principle; it is a rational one. The majority chooses to pretend that it is a scandalous concept that political motivations may actually affect the legislative votes of politicians. Yet this is a basic concept that I think few reasonable people, including our elected officials, would even try to counter. This does not mean that the Legislature acted with any untoward motivations when enacting this statute, but it does mean that a reasonable person should not be blind to considering the possibility that politics may have played a role. One need only look at the continued inquiries being made on the national level to see the disingenuous nature of the position being taken by the majority.

 <http://wvmamerican.edu/ia/cfer/report/report.htm> (accessed May 14, 2007).

 <http://macombdaily.com/stories/093004/loc_fraud001.shtml>(accessed May 30, 2007).

 Available through purchase at <http://select.nytimes.com/gst/abstract.html?res=FB0713FF395BOC728DDDAD0894DF404482> (accessed May 30, 2007).

 Available through purchase at <http://select.nytimes.com/gst/abstract.html?res=F10C15FE34550C758DDDAA0894DF404482> (accessed May 30, 2007).

 Available through purchase at <http://select.nytimes.com/gst/abstract.html?res=F7081FF635550C728EDDAC0894DF404482> (accessed May 30, 2007).

 Available through purchase at <http://www.detnews.com/apps/ pbcs.dll/article?AID=/20060226/METRO/602260301&templ > (accessed July 5, 2007).

 Available at<http://72.14.203.104/search?q=cache:WoHvRHJJ6i0:www. freep.com/newsAocway/voters> (accessed July 5, 2007).

 The United States Constitution provides:
*67 The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax. [US Const, Am XXIV § U

 Available through purchase at <http://nl.newsbank.com/ml _search/we/Archives?s_site=freep&f_sitename=Detroit+Free+P (accessed May 30, 2007).

 A study by the University of Wisconsin-Milwaukee of the driver’s license status of those of voting age in Wisconsin found “[m]any adults do not have either a drivers license or photo ID.” John Pawasarat, The Driver License Status of the Voting Age Population in Wisconsin, Employment and Training Institute, University of Wisconsin-Milwaukee, June 2005, at 1, available at <http://eti.uwm.edu/Dept/ETI/barriers/ DriversLicense.pdf> (accessed May 30, 2007). Twenty-three percent of people aged 65 or older did not have a driver’s license or state photo identification card. Id. “Minorities and poor populations are the most likely to have drivers license problems.” Id. In one county, only 47 percent of African-American adults and 43 percent of Hispanic adults had a valid driver’s license, compared to 85 percent of Caucasian adults in the rest of the state. Id. at 1-2. When examining young adults aged 18-24 in the same county, only 26 percent of African-American young adults and 34 percent of Hispanic young adults had a valid driver’s license, compared to 71 percent of Caucasian young adults in the rest of the state. Id. at 2.
Further, a report by the Commission on Federal Election Reform indicates that 12 percent of the voting age population lack a driver’s license. Building Confidence in U.S. Elections, supra (Comments by Tom Daschle, Spencer Overton, and Raul Yzaguirre).

 The concerns of the amid are further supported by various studies that indicate that a photo identification requirement has a statistically significant effect on voting. Timothy Vercelotti and David Anderson, Protecting the franchise, or restricting it? The effects of voter identification requirements on turnout, Rutgers University, 2006, at 1, available at chttp:// www.eagIeton.rutgers.edu/News-ResearchAbterID_Turnout.pdf> (accessed July 3, 2007).

 Older African-American citizens may experience particular difficulties as many were never issued birth certificates because they were born at home. Leighton Ku, Donna C. Ross, and Matt Broaddus, Survey Indicates Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million Citizens, Center on Budget and Policy Priorities, revised February 17, 2006, available at <http://www.cbpp.org/l-26-06health.htm> (accessed June 26, 2007). One study found that Vs of African-Americans adults born in 1939 and 1940 lacked birth certificates. Id.

 Traveling the required distance to a Secretary of State office may indeed be too burdensome for many citizens, including those in rural areas. For example, Chippewa County has only one Secretary of State office. Secretary of State office locations, available at <http://services.sos.state.mi.us/servicelocator/branchofficelocator.aspx> (accessed July 2, 2007). Yet Chippewa County occupies 1,561.06 square miles, which means that a person may have to travel a significant distance merely to get the identification needed to vote. United States Census Bureau, available at <http://quickfacts.census.gov/ qfd/states/26/26033.html> (accessed July 2, 2007).

 The majority argues that the use of the challenge process to harass voters will be deterred because it is a misdemeanor to do so. See ante at 44. But it is a felony to impersonate another person to vote, yet the majority apparently does not give credence to the fact that this criminal penalty already serves to deter in-person voter fraud. Notably, I again point out that there is no evidence of in-person voter fraud, while there is evidence of voters having been harassed at the polls. See amici brief of the National Association for the Advancement of Colored People et al, at 16-17, 24-25; exhibits 3-6.

 See, e.g., Berry, Comment: Take the money and run: Lame-ducks “quack” and pass voter identification, 74 U Det Mercy L R 291, 297 (1997) (citing Jeff Gerritt, Long Waits Prove Vote System Dated, Detroit Free Press, November 7, 1996) (The wait was so long at some polls that some voters walked in, turned around, and walked out.).